**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| GARDEN OAKS MAINTENANCE | § | Case No. 18-60018 |
| ORGANIZATION, INC. | § | |
| | § | Chapter 11 |
| Debtor. | § | |
| | § | |
| | § | |
| THE OFFICIAL COMMITTEE OF | § | Adv. Pro. No. 18-_____ |
| UNSECURED CREDITORS OF GARDEN | § | |
| OAKS MAINTENANCE ORGANIZATION, | § | |
| INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| GARDEN OAKS MAINTENANCE | § | |
| ORGANIZATION, INC. | § | |
| | § | |
| Defendant. | § | |
| | § | |

**ADVERSARY COMPLAINT FOR DECLARATORY JUDGEMENT**
**AND PERMANENT INJUNCTION**

The Official Committee of Unsecured Creditors (the "Committee" or the "Plaintiff") of Garden Oaks Maintenance Organization, Inc., by and through its undersigned counsel, brings this action against the Garden Oaks Maintenance Organization, Inc. ("GOMO" or the "Defendant") and alleges as follows:

**INTRODUCTION**

1.     This suit arises out GOMO's collection of purportedly "mandatory" assessments upon the transfer of real property ("Transfer Fees") in the Garden Oaks neighborhood despite a

complete lack of authority to do so and the continuing diminution of GOMO's estate through expenditures that have no way of generating revenue.

2.      GOMO and its managers are fully aware that GOMO has no authority to continue receiving the Transfer Fees but have continued to collect and deposit these fees while GOMO acts as a debtor in possession in its bankruptcy case pending before this Court (the "Bankruptcy Case"). GOMO's knowing and intentional violation of the law exposes its estate to unnecessary administrative expenses, including in the form of exemplary damages under Texas law. Continuing to accept the Transfer Fees also covers up and obscures the substantial and continuing diminution of the GOMO's bankruptcy estate—every dollar GOMO brings in from a Transfer Fee results in an administrative expense for *at least* as much even if no additional expense results.

3.      Additionally, GOMO spends approximately $5,060 per month on a "Professional & Services" expense.  Although GOMO did not provide any details in its filings with the Court, the Committee has information that this amount is for professionals who provide services related to the enforcement of deed restrictions, review of construction plans, and similar activities (the "Enforcement Activities"). The Enforcement Activities do not and cannot generate any revenue and do not aid in GOMO's restructuring or the establishment of a successor POA.  The only effect that the Enforcement Activities have on the Bankruptcy Case is to diminish GOMO's estate to the detriment of creditors.

4.      The Committee filed this Adversary Proceeding to preserve the value of GOMO's estate against the diminution resulting from GOMO's actions.

## JURISDICTION AND VENUE

5.      The Court has jurisdiction over this matter over to 28 U.S.C. §§ 157 and 1334(b).

6.      The matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) because, among other reasons, the proceeding seeks an order concerning the administration of the estate and the actions GOMO may take as a debtor in possession.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

## THE PARTIES

8.      The United States Trustee formed the Committee and appointed its members pursuant to section 1102 of title 11 of the United States Code (the "Bankruptcy Code") on May 31, 2018.

9.      GOMO is a nonprofit corporation organized under the laws of Texas, with its principal place of business in Houston, Texas.  GOMO is the debtor and debtor in possession in the Bankruptcy Case.

## BACKGROUND

### A.  GOMO and Its Operations

10.      Garden Oaks is a neighborhood in northwest Houston that was founded in the 1930's.  It comprises five sections that were subdivided by a single developer.  The developer recorded various deed restrictions, limiting the uses to which the parcels could be put.

11.      Since 2002, GOMO has operated as a property owners association (a "POA") under the Texas Property Code for four of the five sections of Garden Oaks.

12.      In this role, GOMO has enforced deed restrictions against property owners and collected assessments that it asserted were mandatory under the Texas Property Code.

13.      GOMO charged assessments in the form of Transfer Fees by demanding payment of 0.75% of the greater of (i) the gross purchase price of property or (ii) the appraisal of the property reflected in the records of the Harris County Appraisal District.  Thus, for example, if a

3

person purchased a home in Garden Oaks, Section 2 for $400,000, GOMO demanded payment of $3,000.

14.     GOMO has continued and continues to receive transfer payments from home purchasers while the Bankruptcy Case is ongoing.

**B.  Garden Oaks Maintenance Organization v. Chang**

15.     GOMO was not and is not a validly formed POA and had and has no authority under the Texas Property Code or any other law to require or demand mandatory assessments.

16.     GOMO was party to litigation with Peter S. Chang and Katherine M. Chang (the ("Changs"), who are residents of Garden Oaks, regarding attempted enforcement of a deed restriction before the Texas state courts.

17.     This litigation resulted in a published opinion of the Court of Appeals of Texas styled *Garden Oaks Maintenance Organization v. Chang*, 542 S.W.3d 117 (Tex. App.—Houston [14th Dist.] 2017).

18.     A true and correct copy of the *Garden Oaks Maintenance Organization v. Chang* Texas Court of Appeals opinion is attached here as **Exhibit A**.

19.     The panel of the Texas Court of Appeals held that GOMO's founders failed to properly form a petition committee under Texas law and thus the deed restriction modification purporting to make GOMO the mandatory POA was invalid with respect to the Changs.

20.     Although the Texas Court of Appeals' decision in *Garden Oaks Maintenance Organization v. Chang* only adjudicated the rights between two homeowners and GOMO, the factual basis for this decision were the actions taken by GOMO's founders and the circumstances under which GOMO was founded.

21.     The circumstances surrounding GOMO's founding determined by the Texas state courts are as follows:

(a) In May 2000, three property owners in Garden Oaks filed a notice of formation of a petition committee to create an operate a property owners association (a "POA") pursuant to pursuant to sections 201.005 and 204.006 of the Texas Property Code. The May 2000 petition committee failed to file a successful petition within one year of the notice, and the committee was dissolved by operation of law.

(b) In July 2001, three property owners within Garden Oaks filed another notice of formation of a petition committee in order to create and operate a POA pursuant to sections 201.005 and 204.006 of the Texas Property Code.  The notice attached an exhibit captioned, "Amendment of Deed Restrictions."

(c) The July 2001 notice of formation of petition committee was invalid, ineffective, and of no force and effect because the timing of the formation of this new committee did not comply with section 201.005(f).

(d) In June 2002, the three individuals who filed the July 2001 notice filed a petition to amend restrictions to create a homeowners association and certificate of compliance with Texas Property Code, section 204.  The petition attached the amendment exhibit and stated that it would be incorporated into the deed restrictions.  The June 2002 petition purported to establish GOMO as the POA for certain sections of Garden Oaks with powers under section 204.010 of the Texas Property Code.

22.     As a result of the facts determined in the preceding paragraph, the Texas Court of Appeals Court held, among other things, that the June 2002 petition (the "June 2002 Petition") purporting to establish GOMO as the POA for certain sections of Garden Oaks was ineffective.

23.     This same June 2002 Petition also purported to establish the system of Transfer Fees implemented by GOMO.

24.     A true and correct copy of the proposed amendment to the deed restrictions through the June 2002 Petition is attached hereto as **Exhibit B**.

25.     A petition for rehearing in was denied in *Garden Oaks Maintenance Organization v. Chang* on January 30, 2018.

### C. The Bankruptcy Case

>    i.    *GOMO's Ongoing Operations as a Debtor in Possession*

26.    GOMO filed a petition for relief under chapter 11 of the Bankruptcy Code on April 11, 2018. Less than three (3) months had passed since the Texas Court of Appeals declined to reconsider its decision in *Garden Oaks Maintenance Organization v. Chang*.

27.    GOMO continues to operate as a debtor in possession.  As described to the Court in GOMO's *Emergency Motion to Approve Operating Budget* [Bankruptcy Docket No. 20] (the "Operating Budget Motion"), GOMO spends approximately $8,686.47 per month in the ordinary course of its business.  Additionally, GOMO intends to incur expenses of at least $10,000 to re-form a petition committee and perform the necessary steps to establish a duly authorized POA under the Texas Property Code.

28.    The Operating Budget Motion indicates that GOMO's average income over the prior 12 months was $17,026.58 per month.

29.    The large majority of GOMO's past revenues were from the collection of Transfer Fees. In 2015, GOMO's revenue was approximately $291,119.  Of this, $289,034 (i.e., all but $2,085) was the result of the assessment of Transfer Fees. In 2016, GOMO's revenue was approximately $273,604. Of this, $272,567 (i.e., all but $1,037) was the result of Transfer Fees.

30.    GOMO is prohibited under its organizational documents from assessing fines or filing liens on properties.

31.    True and correct copies of GOMO's audited financial statements for the years 2015 and 2016 are attached hereto as **Exhibit C** and **Exhibit D**, respectively.

32.    GOMO's asserted authority to assess mandatory Transfer Fees was pursuant to chapter 204 of the Texas Property Code.

6

33.     In *Garden Oaks Maintenance Organization v. Chang*, the Texas Court of Appeals held that because of GOMO's improper founding, GOMO did not have the powers enumerated in section 204.010 of the Texas Property Code.

34.     Among the powers enumerated in section 204.010 of the Texas Property Code is to "adopt and amend budgets for revenues, expenditures, and reserves and collect regular assessments or special assessments for common expenses from property owners."

35.     GOMO has continued to publically represent that Transfer Fees are mandatory on its website. However, in GOMO's Emergency Motion to Authorize Deposit of Funds [Bankruptcy Docket No. 6], GOMO noted that its board was reluctant to deposit the funds received and sought an order of this Court authorizing the action.

36.     A true and correct printed copy dated June 25, 2018, of GOMO's website under the heading "Fee and HOA Information" is attached hereto as **Exhibit E**.

37.     As GOMO has no authority to require transfer fees, any fees it does receive become administrative expenses of the GOMO's bankruptcy estate.  It has no ultimate right to those funds. Thus, GOMO's income is zero after deducting for administrative expenses despite GOMO's representation in the Operating Budget Motion showing significant positive cash flow.

38.     Further, because GOMO continues to assert that it has the authority to require transfer fees and that such fees are mandatory, GOMO may be liable for exemplary damages under Texas law.  According to section 41.003 of the Texas Civil Practice & Remedies Code, harm caused by fraud may result in exemplary damages.

    ii.     *GOMO's Schedules of Assets and Liabilities*

39.     According to GOMO's schedules of assets and liabilities, GOMO is insolvent.

40.     GOMO lists total unsecured claims of $2,948,193.47 on its amended Schedule E/F [Bankruptcy Docket No. 19].  Each of these claims is listed as disputed and contingent. GOMO left the space for the basis of the claim blank in each instance.

41.     Against these unsecured claims, GOMO lists total assets of $2,414,723.23 on its Schedule A/B [Bankruptcy Docket No. 14].  These assets include (i) $501,872.53 in cash or cash equivalents; (ii) $1,954.00 in inventory; and (iii) $5,184 in office furniture and equipment. The rest comprises $34,360.20 of accounts receivable and $1,871,352.50 of net operating losses.

42.     Since 2003, GOMO has not used any of its net operating losses from the prior year. Historically, GOMO has not made any taxable profit.

43.     On information and belief, the accounts receivable indicated on GOMO's Schedule A/B reflect unpaid Transfer Fees assessed by GOMO but not paid by the purchaser or seller of the property.

## COUNT I

### (DECLARATORY JUDGMENT THAT GOMO IS NOT ENTITLED COLLECT MANDATORY TRANSFER FEES PURSUANT TO BANKRUPTCY CODE § 105)

44.     The Committee repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

45.     For the reasons set forth in by the Texas Court of Appeals in *Garden Oaks Maintenance Organization v. Chang*, 542 S.W.3d 117 (Tex. App.—Houston [14th Dist.] 2017), GOMO is not properly formed such that it has the powers provided under chapter 204 of the Texas Property Code.

46.     GOMO has no authority or right to collect or receive Transfer Fees.

47.     Nonetheless, GOMO has continued to assert that it is entitled to these Transfer Fees and, on this basis, has (i) filed misleading documents with the Court, such as its schedules

8

of assets and liabilities, and the Operating Budget Motion, (ii) continues to publically claim and advertise that the Transfer Fees are mandatory, and (iii) has delayed in taking significant steps toward administering the Bankruptcy Case.

48.     An actual, present, and justiciable controversy has arisen between GOMO and the Committee regarding GOMO's authority to continue to collect the Transfer Fees.

49.     The Committee therefore seeks an order declaring that GOMO lacks authority and is not entitled to collect the Transfer Fees.

<u>**COUNT II**</u>

**(INJUNCTION PROHIBITING THE COLLECTION OR RETENTION OF TRANSFER FEES PURSUANT TO BANKRUPTCY CODE § 105)**

50.     The Committee repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

51.     On information and belief, because of GOMO's long-standing and ongoing assertion that it has authority to assess mandatory Transfer Fees, many real estate agents, realtors, and title insurance companies will not work with a potential home buyer in the Garden Oaks neighborhood without the payment of the Transfer Fee to GOMO.

52.     Even if the Court were to enter the declaratory judgment requested in Count I, some parties, would likely continue to send Transfer Fees to GOMO because they were unaware of the judgement.

53.     Such mistaken payments would likely amount to administrative claims against GOMO's estates.   Additionally, resolving this confusion would incur more administrative expenses and interfere with the review of GOMO's finances by parties in interest.

54.     Active efforts to collect Transfer Fees may amount to fraud under Texas Law, which would expose GOMO's estate to the possibility of exemplary damages in excess of the amounts of the Transfer Fees.

55.     Unsecured creditors would be harmed by GOMO's retention or active collection of Transfer Fees because of the increase in administrative expenses of the estate, reduced clarity, and possible exemplary damages, among other things.

56.     No adequate remedy exists at law as any incurred administrative expenses would have priority over claims of unsecured creditors pursuant to the Bankruptcy Code.

57.     The Committee therefore seeks an order enjoining GOMO from collecting or retaining Transfer Fees.

### COUNT III

**(INJUNCTION PROHIBITING USE OF ESTATE FUNDS FOR ENFORCEMENT OF DEED RESTRICTIONS OR REVIEW OF CONSTRUCTION PLANS PURSUANT TO BANKRUPTCY CODE §§ 105, 1107(a), AND 1108)**

58.     The Committee repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

59.     As currently scheduled, GOMO's liabilities to unsecured creditors far exceed its assets that that can feasibly be liquidated into cash for distribution.

60.     GOMO has no means of generating significant revenue.

61.     According to the Operating Budget Motion, GOMO's anticipates expending $8,686.47 per month while in bankruptcy for ordinary-course operations. Of this amount, $5,060 (58%) is listed as an amount for "Professional & Services."

62.     On information and belief (as no detail was attached to the Operating Budget Motion) this amount is for professionals who provide services related to the enforcement of deed restrictions, review of construction plans, and similar activities (the "Enforcement Activities").

63.     The Enforcement Activities do not generate any revenue that could be used to satisfy the claims of unsecured creditors.

64.     The Enforcement Activities do not aid in GOMO's restructuring or the establishment of a successor POA.

65.     The Enforcement Activities distract GOMO from putting its full efforts toward obtaining confirmation of a chapter 11 plan inuring to the benefit of creditors and other parties in interest.

66.     It is in the best interest of GOMO's estate and GOMO's creditors that the Enforcement Activities cease unless a chapter 11 plan can be confirmed or as otherwise ordered by the Court.

67.     The Committee therefore seeks an order enjoining GOMO from using estate property to fund Enforcement Activities, subject to modification by a chapter 11 plan or as otherwise ordered by the Court.

## PRAYER FOR RELIEF

Wherefore, the Committee respectfully requests that the Court enter a judgment in its favor and an order:

A.  Declaring that declaring that GOMO lacks authority and is not entitled to collect mandatory Transfer Fees.

B.  Enjoining GOMO from collecting or retaining any Transfer Fees.

C.  Enjoining GOMO from using estate property to fund any Enforcement Activities.

D.  Granting such other and further relief as provided for by law or as this Court deems just and proper.

DATED: June 28, 2018

Respectfully submitted,

**DIAMOND MCCARTHY LLP**

By:      */s/ Charles Rubio*
Charles Rubio
TBA No. 24083768
crubio@diamondmccarthy.com
R. J. Shannon
TBA No. 24108062
robert.shannon@diamondmccarthy.com
909 Fannin, Suite 3700
Houston, Texas 77010
Telephone: (713) 333-5100

*Proposed Counsel to the Official Committee of Unsecured Creditors.*

# EXHIBIT A

**Garden Oaks Maintenance Organization v. Chang**

542 S.W.3d 117
Court of Appeals of Texas,
Houston (14th Dist.).

GARDEN OAKS MAINTENANCE ORGANIZATION, Appellant/Cross-Appellee
v.
Peter S. CHANG and Katherine M. Chang, Appellees/Cross-Appellants

NO. 14-16-00537-CV
|
Opinion filed November 14, 2017
|
Rehearing Denied January 30, 2018

**Synopsis**
**Background:** Purported property owners' association filed suit against homeowners in subdivision, alleging that additional two-car garage they constructed on their property violated deed restriction, and seeking permanent injunction and civil damages. Homeowners filed counterclaim for declaratory relief. Following trial, the 269th District Court, Harris County, rendered judgment against property owners' association and in favor of homeowners. Appeal was taken.

**Holdings:** The Court of Appeals, Marc W. Brown, J., held that:

[1] homeowners adequately stated declaratory judgment counterclaim that did not repeat affirmative defenses;

[2] evidence was sufficient to establish that association was not formed correctly pursuant to restrictive covenants statutes;

[3] homeowners failed to establish that association's bylaws had no force and effect;

[4] association had standing and capacity to bring action against homeowners for alleged garage deed restriction violation; and

[5] homeowners were not entitled to attorney's fees.

Affirmed as modified.

**\*120  On Appeal from the 269th District Court, Harris County, Texas, Trial Court Cause No. 2012-72213**

**Attorneys and Law Firms**

Shawn McKee, Casey Jon Lambright, Andrew Joseph Mihalick, Houston, TX, for Appellees.

David M. Gunn, David K. Anderson, W. Austin Barsalou, Houston, TX, for Appellant.

Panel consists of Justices Christopher, Brown, and Wise.

## OPINION

Marc W. Brown, Justice

This case involves the attempted enforcement of a deed restriction against building more than a single one-car or two-car garage on a property located in the Garden Oaks, Section 3, Subdivision (the "Subdivision"). Appellant Garden Oaks Maintenance Organization ("GOMO") filed suit against appellees Peter S. Chang and **\*121** Katherine M. Chang seeking a permanent injunction to have the Changs remove "the additional two-car garage" they constructed on their property in the Subdivision and seeking civil damages for each day they violated the garage deed restriction. The Changs brought counterclaims for declaratory relief based on GOMO's lack of authority to enforce deed restrictions as a property owners' association under sections 201.005 and 204.006 of the Texas Property Code and under GOMO's bylaws.

At trial, the jury found that the Changs failed to comply with the garage deed restriction. Additionally, the jury found: such failures were excused by abandonment; the deed restriction was waived; GOMO's exercise of authority to enforce the restriction was unreasonable; and GOMO should be awarded no civil damages. The jury further found that a reasonable fee for the necessary services of the Changs' attorneys in the case was $80,000. In its final judgment, the trial court rendered judgment against GOMO and in favor of the Changs. The trial court issued four declarations and did not award attorney's fees to the Changs.

GOMO presents two issues on appeal: (1) whether the trial court erred by failing to dismiss the Changs' declaratory-judgment counterclaims and (2) whether the declarations are erroneous. The Changs present one issue on cross-appeal: whether the trial court should have awarded the Changs their attorney's fees.

We conclude that the Changs' declaratory-judgment counterclaims were permissible because they related to an actual, justiciable controversy and had and continue to have practical consequences. However, we conclude that the trial court erred in making declarations three and four. We also conclude that the trial court did not abuse its discretion by not awarding the Changs attorney's fees. Accordingly, we modify the trial court's judgment to delete the erroneous declarations and affirm the judgment as modified.

## I. BACKGROUND

Garden Oaks Co. was the original owner of the lots forming Garden Oaks, Section Three, Subdivision. In 1939, Garden Oaks Co. recorded a set of deed restrictions applicable to the Subdivision, which provided that Garden Oaks Co. had the right to enforce the restrictions. The deed restrictions provided:

> All lots in the tract shall be known and described as residential lots, and no structure shall be erected on any residential building plot other than one detached single family dwelling not to exceed two stories in height and a one or two car garage.

Garden Oaks Co. no longer exists and did not exist at the time that the instant dispute arose.

In May 2000, three property owners within the Subdivision filed a notice of formation of petition committee in order to create and operate a property owner's association ("POA") pursuant to sections 201.005 and 204.006 of the Texas Property Code. The May 2000 petition committee failed to file a successful petition within one year of the notice, and the committee was dissolved by operation of law.

In July 2001, three property owners within the Subdivision filed another notice of formation of petition committee in order to create and operate a POA pursuant to sections 201.005 and 204.006 of the Texas Property Code. The notice

attached an exhibit captioned, "Amendment of Deed Restrictions." In June 2002, the three individuals who filed the July 2001 notice filed a petition to amend restrictions to create a homeowners association and certificate of compliance with **\*122** Texas Property Code, section 204. The petition attached the amendment exhibit and stated that it would be incorporated into the deed restrictions.

In 2010, GOMO filed a subdivision management certificate. In 2011, Peter and Katherine Chang planned to build a new home on a lot in the Subdivision. The Changs through their builder submitted their proposed construction plans for the home to GOMO for approval. GOMO rejected the Changs' plans several times because the deed restrictions did not allow for more than a single one-car or two-car garage per lot. GOMO finally approved the Changs' plans with the caveat that the " 'garage' label be removed from the attic space over the studio" due to "concern that the studio could be converted to a garage in the future." The Changs built their home. After the Changs moved in, they replaced one of the studio walls with a garage door.

In December 2012, GOMO filed suit against the Changs for injunctive relief and for civil penalties under section 202.004(c) of the Property Code based on an alleged violation of the garage deed restriction. The Changs answered, asserting a general denial, a plea to the jurisdiction, verified pleas, and various affirmative defenses. In addition, the Changs filed counterclaims for declaratory relief.

At trial, the jury returned these findings:

• The Changs both failed to comply with the deed restrictions;

• The failure to comply was excused by abandonment;

• The deed restriction in question had been waived;

• GOMO's exercise of authority to enforce the deed restriction in question was unreasonable;

• GOMO should be awarded $0 against the Changs as civil damages for the failure to comply with the deed restrictions; and

• A reasonable fee for the necessary services of the Changs' attorneys in this case was $80,000.00. [1]

The Changs moved for entry of judgment. GOMO filed objections and a motion for JNOV and to disregard jury findings. The trial court denied GOMO's JNOV motion. The Changs filed a motion for declaratory relief and final judgment. On June 8, 2016, the trial court signed an order on the Changs' motion for declaratory relief and for final judgment. The trial court concluded that "it should grant judgment on the verdict and for declaratory relief, but that it should deny judgment for attorneys' fees."

That same day, the trial court also signed its final judgment. In its final judgment, the trial court stated that:

• The Changs' failure to comply with the garage deed restriction was excused by abandonment;

• The garage deed restriction had been waived;

• GOMO's exercise of authority to enforce the garage deed restriction was unreasonable;

• GOMO should take nothing on its claims against the Changs;

• The Changs should recover on their claims for declaratory relief; and

• The Changs should take nothing on their claims for attorney's fees.

The trial court further rendered these declarations:

1. The Notice of Formation of Petition Committee filed on July 23, 2001 under Harris County Clerk's File No. V191699 (and the amendment **\*123** attached thereto) is invalid, ineffective, and of no force and effect with respect to Defendants Peter S. Chang and Katherine M. Chang;

2. The Petition to Amend Restrictions filed on June 3, 2002, under Harris County Clerk's File No. V842579 is ineffective and of no force and effect with respect to Defendants Peter S. Chang or Katherine M. Chang;

3. The By-Laws of Garden Oaks Maintenance Organization have no force and effect against Defendants Peter S. Chang or Katherine M. Chang; and

4. Garden Oaks Maintenance Organization has no authority or standing to pursue any legal action against Defendants Peter S. Chang or Katherine M. Chang for violations of any alleged deed restrictions in the Garden Oaks Section Three.

Both GOMO and the Changs appealed the trial court's final judgment.


## II. ANALYSIS

### A. The Changs' declaratory-judgment counterclaims

 **[1]**   In its first issue, GOMO argues for reversal of the trial court's declarations because the Changs' declaratory-judgment counterclaims impermissibly repeated their affirmative defenses.[2]

Texas's Declaratory Judgments Act (the "Act") is based upon the Uniform Declaratory Judgments Act. *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.001 *et seq.* (West 2015). The Act's "purpose is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations." *Id.* § 37.002(b). The Act "is to be liberally construed and administered." *Id.* Under the Act:

> A person interested under a deed, will, written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder.

*Id.* § 37.004(a). A contract may be construed either before or after a breach. *Id.* § 37.004(b). "A court of record within its jurisdiction has power to declare rights, status, and other legal relations whether or not further relief is or could be claimed." *Id.* § 37.003(a).

 **[2]**   Although the Act generally is not available to settle disputes already pending before a court, the Supreme Court of Texas has recognized that "[i]n certain instances, ... a defensive declaratory judgment may present issues beyond those raised by the plaintiff," such as where "there is an ongoing and continuing relationship." *BHP Petroleum Co. v. Millard*, 800 S.W.2d 838, 841–42 (Tex. 1990) (where plaintiff sued for breach of take-or-pay obligations of gas-purchase contract, because defendant's declaratory-judgment counterclaim seeking interpretation of contract would define parties' future obligations and had "greater ramifications," it was permissible); *Drexel Corp. v. Edgewood Dev., Ltd.*, 417 S.W.3d 672, 678 (Tex. App.—Houston [14th Dist.] 2013, no pet.) ("[I]n certain instances a 'defensive' declaratory judgment will survive a nonsuit when there are continuing obligations between the parties." (citing **\*124** *Millard*, 417 S.W.3d at 841 & n.8)). To qualify as a claim for affirmative relief, a defensive pleading must allege that the defendant has a cause

of action, independent of the plaintiff's claim, on which he could recover benefits, compensation or relief, even if the plaintiff abandons his cause of action or fails to establish it. *Millard*, 417 S.W.3d at 841.

**[3]  [4]  [5]** According to GOMO, the Changs merely "recast their affirmative defenses as a declaratory-judgment counterclaim." GOMO relies on the Changs' "pleading history." GOMO first argues that the Changs asserted their defenses prior to bringing their counterclaims. However, the timing of a defendant's declaratory-judgment counterclaim alone does not dictate whether the claim is a permissible one. *See Friedman v. Rozzlle*, No. 13-12-00779-CV, 2013 WL 6175318, at *10 (Tex. App.—Corpus Christi Nov. 21, 2013, pet. denied) (mem. op.) (rejecting timing-based argument where defendant POA did not assert declaratory-judgment counterclaim until after plaintiff homeowners made their claims). GOMO also asserts that the Changs' defenses and the headings in their counterclaims "mirror" each other. The use of "creative pleading" by merely restating defenses in the form of a declaratory-judgment action cannot deprive the plaintiff of its right to take a nonsuit. *Millard*, 800 S.W.2d at 841. Nor can mere repleading of claims or defenses serve as the basis for declaratory judgment or attorney's fees thereunder. *See Etan Indus., Inc. v. Lehmann*, 359 S.W.3d 620, 624–25 (Tex. 2011) (per curiam) (citing *MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 669 (Tex. 2009)). At the same time, we also must look to the substance of a plea for relief, not merely its titles and headings, to determine the nature of relief sought. *See Surgitek, Bristol–Myers Corp. v. Abel*, 997 S.W.2d 598, 601 (Tex. 1999); *State Bar of Tex. v. Heard*, 603 S.W.2d 829, 833 (Tex. 1980).

GOMO in its live pleading alleged that the Changs violated the garage deed restriction. According to GOMO, it therefore was entitled to a permanent injunction that the Changs remove the additional two-car garage and to civil damages under section 202.004(c) for each day the Changs were in violation of the restriction. The Changs raised eleven affirmative defenses, including lack of standing and lack of authority. The Changs also brought declaratory-judgment counterclaims. In their request for declaratory relief, the Changs sought declarations about the invalidity and ineffectiveness of the July 2001 notice of formation of petition committee and attached amendment exhibit and of the June 2002 petition that purported to establish GOMO as the POA for the Subdivision with powers under section 204.010 of the Property Code. In addition, the Changs sought a declaration that the by-laws of GOMO have no force and effect against them. Finally, the Changs sought a declaration that GOMO has no authority or standing to pursue any legal action against the Changs for violations of any deed restrictions.

We find *Indian Beach Property Owners' Association v. Linden*, 222 S.W.3d 682 (Tex. App.—Houston [1st Dist.] 2007, no pet.), instructive. In *Indian Beach*, Indian Beach Property Owners' Association brought suit against Mary and B.J. Linden after the Lindens built a chain-link fence on Mary's property. 222 S.W.3d at 688–90. Indian Beach POA asserted that the Lindens had violated certain deed restrictions in building the fence without first obtaining approval. *Id.* at 690. The Lindens then filed counterclaims against Indian Beach POA, seeking a declaration from the trial court that the construction of the fence  **\*125** was in compliance with the deed restrictions applicable to Mary's property. *Id.*

On appeal, our sister appellate court addressed the issue of whether the Lindens' counterclaims for a declaratory judgment constituted claims for affirmative relief. *Id.* at 700–02. In holding that they did, the *Indian Beach* court explained that the Lindens' counterclaims sought a declaration that they were "in compliance with the contractual deed restrictions regarding the construction of their fence." *Id.* at 702. Further, the deed restrictions on the property involved the Lindens' "ongoing and continuous relationship with Indian [Beach POA]." *Id.* Because the Lindens' claims for declaratory relief "involve[d] the interpretation of deed restrictions" and, therefore, the parties' future obligations under those restrictions, the Lindens had "stated a cause of action on which they could recover benefits, compensation, or relief [even] if Indian [Beach POA] abandoned or failed to establish its cause of action." *Id.* (citing *Millard*, 800 S.W.2d at 842; and Tex. Civ. Prac. & Rem. Code § 37.003(a)).

Additionally, we find *Friedman v. Rozzlle* instructive. In *Friedman*, homeowner Rozzlle who operated a cottage-rental business filed a declaratory-judgment action against the Sun Harbour Cottages Unit 1 Owners' Association and other homeowners, including Friedman. 2013 WL 6175318, at *1. Rozzlle sought a declaration that a certain deed restriction

involving short-term rentals should not be enforced as void and waived. *Id.* Friedman filed counter- and cross-claims that Rozzlle and other homeowners had violated the short-term rental restriction and that Sun Harbour was required to take steps to stop these violations. *Id.* Sun Harbour filed a cross-claim against Friedman seeking declaratory-relief that Sun Harbour had no duty to enforce the deed restrictions. *Id.*

The appellate court considered Friedman's challenge to Sun Harbour's award of attorney's fees under the Act and whether Sun Harbour's declaratory counterclaim was permissible. *Id.* at *10–11. Because Sun Harbour sought a declaration of its rights that went beyond a mere defense to Friedman's claim for specific relief that Sun Harbour had a duty to enforce the short-term rental restriction and would have "the effect of settling future disputes as to the duty of [Sun Harbour] to enforce all restrictions," the *Friedman* court concluded that Sun Harbour's declaratory-judgment cause of action was cognizable under section 37.004(a) of the Act. *Id.* at *11 (citing *Millard,* 800 S.W.2d at 841–42). The *Friedman* court noted that even if Friedman had nonsuited her cross-claim, Sun Harbour "could have pursued its request for a declaration that it had no general duty to enforce the conditions and covenants of the Declaration." *Id.* (citing *Indian Beach,* 222 S.W.3d at 702); *see also Castille v. Serv. Datsun, Inc.,* No. 01-16-00082-CV, 2017 WL 3910918, at *7–8 (Tex. App.—Houston [1st Dist.] Sept. 7, 2017, no pet. h.) (mem. op.) (where plaintiff property owners brought claim that defendant Service Datsun's operation of RV park on its property violated two deed restrictions, Service Datsun's declaratory-judgment counterclaim which sought declaration about "the validity, or legal effect, of the [Gulfview subdivision deed] restrictions" and that "the continued operation of [its RV] park is not prohibited or restricted by" any deed restrictions constituted "cause of action on which [defendant] could recover benefits, compensation, or relief even if appellants had abandoned or failed to establish their own cause of action" (citing *Indian Beach,* 222 S.W.3d at 702; and *Friedman,* 2013 WL 6175318, at *10–11)).

GOMO's attempt to distinguish *Indian Beach* fails. GOMO contends that, unlike **\*126** the homeowner defending against a fence deed restriction in *Indian Beach,* the Changs did not seek an interpretation of the deed restrictions or a declaration that their additional garage was in compliance with all the deed restrictions. *See id.* However, the Act does not limit the subject matter of relief only to declarations of rights or status under deed restrictions, but instead reaches "any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise" at issue. *See* Tex. Civ. Prac. & Rem. Code Ann. § 34.004(a). Here, the Changs requested declarations regarding the invalidity of documents purportedly establishing GOMO as a POA under sections 201.005 and 204.006 of the Property Code and regarding the invalidity of GOMO's by-laws. The requested declarations would affect the ongoing future relationship of the parties concerning all the deed restrictions, not only the garage deed restriction at issue in GOMO's lawsuit. If the Changs were able to establish that GOMO was not a properly formed POA under sections 201.005 and 204.006 and could not rely on its by-laws for purposes of enforcement, then this would defend against GOMO's "garage" cause of action, but also would establish that GOMO was unable to enforce *all* of the other deed restrictions against the Changs. Since the Changs sought this additional relief, their counterclaims had "greater ramifications" than GOMO's original suit and "practical consequences" for the parties' ongoing relationship. *See Millard,* 800 S.W.2d at 842; *Transp. Ins. Co. v. WH Cleaners, Inc.,* 372 S.W.3d 223, 231 (Tex. App.—Dallas 2012, no pet.) ("[A] declaration of rights under the circumstances presented has practical consequences.").

GOMO's cited cases do not persuade us otherwise. In *Anderson v. The New Property Owners' Association of Newport, Inc.,* 122 S.W.3d 378, 383 (Tex. App.—Texarkana 2003, pet. denied), the New POA of Newport (NPOAN) filed suit against property owner Anderson to stop the construction of a driveway. Anderson entered a verified denial challenging NPOAN's standing and capacity and, apparently, filed a counterclaim for declaratory relief. *See id.* After a bench trial, the trial court ordered Anderson to remove the driveway and awarded NPOAN attorney's fees. *Id.* The appeals court reversed and rendered judgment in favor of Anderson, determining that although NPOAN had standing and capacity to sue Anderson, it did not have authority to approve or reject her driveway plans either pursuant to assignment or under the Property Code. *Id.* at 385, 388–90. The appeals court concluded that Anderson could not receive attorney's fees under section 37.009 of the Act because NPOAN's cause of action involved "the same parties and same issues as alleged in Anderson's counterclaim." [3] *Id.* at 390–91 (refusing to apply *Millard*). In that case, however, there was no

need to define the parties' ongoing relationship or status because in the meantime NPOAN had taken steps to record amendments to the deed restrictions to gain "full authority" as a POA. *Id.* at 391.[4] *Anderson*, therefore, does not control our determination of this issue.

**\*127** The other cases GOMO relies on in its brief—*Tanglewood Homes v. Feldman*, 436 S.W.3d 48 (Tex. App.—Houston [14th Dist.] 2014, pet. denied),[5] and *City of Houston v. Texan Land & Cattle Co.*, 138 S.W.3d 382 (Tex. App.—Houston [14th Dist.] 2004, no pet.)[6]—did not address the propriety of a declaratory-judgment counterclaim under *Millard* and are distinguishable on this issue.[7]

GOMO also relies on the Texas Supreme Court's decision in *Etan Industries v. Lehmann*.[8] According to GOMO, because it already had lost under the jury's verdict and there was no reasonable basis to anticipate "future fights" between GOMO and the Changs related to their garage, there was no need for any declaratory judgment. *Etan* does not dictate the result here. In *Etan*, plaintiff property owners the Lehmanns brought trespass claims against defendant cable provider Etan, and also sought declaratory and injunctive relief. With respect to the property at issue, the jury found that Etan had trespassed when it placed its cable lines. 359 S.W.3d at 622. The trial court rendered judgment on the jury's verdict, and awarded the requested declaratory and injunctive relief. *Id.* at 622–23. The *Etan* Court considered whether the Lehmanns' claims for declaratory judgment that Etan lacked easements or rights-of-way on the Lehmanns' property **\*128** were moot. *Id.* at 624. The Court concluded that the Lehmanns' declaratory-judgment claims were moot under circumstances where the cable provider already had removed its lines from the property before trial. *Id.* There, the Court concluded that "the trial court had no reason to declare that Etan could not place lines on the Lehmanns' property, absent a reasonable basis for concluding that without a declaratory judgment Etan might do so in defiance of the court's judgment finding it liable for trespass." *Id.* The Court explained the Act "is not appropriately employed to remedy a trespass occurring prior to trial that is the subject of a separate common-law trespass claim" and instead should function in the interest of "preventative justice." *Id.* (citing *Cobb v. Harrington*, 144 Tex. 360, 190 S.W.2d 709, 713 (1945) (declaratory-judgment action "is an instrumentality to be wielded in the interest of preventative justice and its scope should be kept wide and liberal, and should not be hedged about by technicalities")). The Court also concluded that the Lehmanns' declaratory-judgment claims simply duplicated their common-law trespass claims and there was no apparent benefit to the Lehmanns aside from attorney's fees. *Id.*

Here, there is no dispute that the Changs still reside in and own the property subject to all the recorded deed restrictions, not just the garage deed restriction. At trial, there was evidence that GOMO believes the Changs' house constitutes "in itself ... a visual black [sic] in the neighborhood" and is "a problem for our neighborhood." GOMO told Mr. Chang: "We have a war chest of $360,000, and we are not afraid to spend it on you." In their motion for declaratory relief, the Changs sought "to settle and provide relief from uncertainty and insecurity" surrounding the rights and legal status of the parties, specifically under sections 201.005 and 204.006 of the Property Code and under GOMO's by-laws. According to the Changs, their "cause of action for declaratory relief ... w[ould] define the obligations of the parties under the restrictions, and in the future." With such a judgment in hand, the Changs would attain the benefit of preventing GOMO from using such allegedly-invalid authority to enforce deed restrictions against them in the future.

On this record, the Changs' requests for declaratory relief did not merely duplicate the garage deed-restriction issues litigated via GOMO's claims and were not moot. The Changs' requested declarations went beyond what would be implicit or express in a final judgment concerning GOMO's claims for an injunction and civil damages related to the Changs' additional two-car garage. *Cf. id.* at 624–25. The Changs stated declaratory-judgment causes of action on which they could recover benefits or relief even if GOMO had abandoned or failed to establish its claims related to enforcement of the garage deed restriction. *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.004(a). Namely, that the Changs as continuing property owners in the Subdivision were not, and would not be, subject to enforcement of any of the deed restrictions by GOMO either based on its status as a POA created under sections 201.005 and 204.006 of the Property Code or under its by-laws. *See Friedman*, 2013 WL 6175318, at *10–11; *Indian Beach*, 222 S.W.3d at 702.

We overrule GOMO's first issue.

## B. The trial court's declarations

[6]   [7]   In its second issue, GOMO argues that the trial court's declarations are  *129  erroneous on the merits.[9]  GOMO contends that although the trial court acknowledged that the Changs bore the burden of proof on their declaratory-judgment claims, the trial court did not hold the Changs to their burden. According to GOMO, when the trial court faced uncertainty in the evidence, instead of denying the Changs' counterclaims, the trial court "inexplicably" found that GOMO lost. In our review of the merits, we keep in mind it is firmly established that, in a declaratory-judgment action, the party who asserts an affirmative claim for relief has the burden of proving its allegations. *Saba Zi Expl., LP v. Vaughn*, 448 S.W.3d 123, 129 n.11 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *see Castille*, 2017 WL 3910918, at *3, 7 (citing *Vaughn*, 448 S.W.3d at 129 n.11).

We review declaratory judgments under the same standards as other judgments. Tex. Civ. Prac. & Rem. Code Ann. § 37.010. We look to the procedure used to resolve the issue below to determine the standard of review on appeal. *Lidawi v. Progressive Cty. Mut. Ins. Co.*, 112 S.W.3d 725, 730 (Tex. App.—Houston [14th Dist.] 2003, no pet.). Here, the case was submitted to the jury, and it returned findings generally in favor of the Changs. Post trial, the Changs moved for entry of judgment against GOMO on the verdict. GOMO filed a motion for JNOV and to disregard jury findings. The trial court denied GOMO's motion. Post trial, the Changs also moved for declaratory relief and final judgment. In their motion for declaratory relief, the Changs relied on trial exhibits (the May 2000 notice of formation of petition committee, the July 2001 notice of the formation of petition committee, the amendment of deed restrictions exhibit, the June 2002 petition to amend restrictions, GOMO's subdivision management certificate) and trial testimony (by GOMO's representative Tim Weltin). The Changs included as an exhibit to their motion the original version of H.B. 2152, as introduced March 7, 1995. GOMO filed a response. After hearing argument on the Changs' motions,[10] the trial court took the motions under advisement. Based on the pending motions, responsive briefing, evidence presented, arguments, and the applicable law, the trial court concluded that it should grant judgment on the verdict and declaratory relief.

[8]   [9]   GOMO does not challenge the entry of judgment with regard to its claims; instead, GOMO challenges the trial court's granting of the Changs' motion for declaratory relief. Both GOMO and the Changs rely on application of the Property Code. GOMO argues that it was properly created as a POA under section 204.006 and, in any event, GOMO has authority to enforce the deed restrictions against the Changs under section 202.004. The Changs assert that GOMO did not comply with sections 201.005 and 204.006, and that even if GOMO's bylaws provided for enforcement authority, they were not properly recorded under section 202.006. When a motion for declaratory relief requires the trial court to interpret the parties' rights and status pursuant to statute, we apply de novo review. *See City of Houston v. Hildebrandt*, 265 S.W.3d 22, 25 (Tex. App.—Houston [1st Dist.] 2008, pet. denied); *see also Gillebaard v. Bayview Acres Ass'n, Inc.*, 263 S.W.3d 342, 349 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) ("Our analysis requires interpreting the provisions of Texas Property Code chapter 204. Statutory interpretation is a question of law, and our review is thus de novo."). We must uphold the trial court's  *130  determination in a declaratory-judgment action if it is sustainable upon any legal theory supported by the evidence. *Tanglewood*, 436 S.W.3d at 66.

### 1. Texas Property Code

The overriding goal of statutory interpretation is to determine and give effect to the legislature's intent. *Texas Mut. Ins. Co. v. Ruttiger*, 381 S.W.3d 430, 452 (Tex. 2012). In order to ascertain legislative intent, we first look to the plain and common meaning of the words used by the legislature. *See* Tex. Gov't Code Ann. § 311.011(a) (West 2013); *Ruttiger*, 381 S.W.3d at 452; *Tex. Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 642 (Tex. 2004). "If the statutory language is unambiguous, we must interpret it according to its terms, giving meaning to the language consistent with other provisions in the statute." *Sunset Valley*, 146 S.W.3d at 642. It is a well-settled rule of statutory construction that

every word of a statute must be presumed to have been used for a purpose. *In re Bell*, 91 S.W.3d 784, 790 (Tex. 2002). We do not confine our review to isolated statutory words, phrases, or clauses, but rather we examine the entire act as a whole. *Sunset Valley*, 146 S.W.3d at 642; *Meritor Auto., Inc. v. Ruan Leasing Co.*, 44 S.W.3d 86, 90 (Tex. 2001).

Chapter 201 of the Property Code, "Restrictive Covenants Applicable to Certain Subdivisions," "applies to a residential real estate subdivision that is located in whole or part ... within a city that has a population of more than 100,000." Tex. Prop. Code Ann. § 201.001(a)(1) (West 2014). Chapter 201's stated purposes include "to provide a procedure for extending the term of, creation of, additions to, or modification of restrictions." *Id.* § 201.002. Under section 201.005, "Petition Committee":

(a) At least three owners may form a petition committee. The committee shall file written notice of its formation with the county clerk of each county in which the subdivision is located.

(b) A notice filed under this chapter must contain:

(1) a statement that a petition committee has been formed for the extension of the term of, creation of, addition to, or modification of one or more restrictions;

(2) the name and residential address of each member of the committee;

(3) the name of the subdivision to which the restrictions apply and a reference to the real property records or map or plat records where the instrument or instruments that contain the restrictions sought to be extended, added to, or modified are recorded or, if the creation of a restriction is proposed, a reference to the place where the map or other document, if any, is recorded;

(4) a general statement of the matters to be included in the petition;

(5) if the creation of a restriction for a subdivision is proposed, a copy of the proposed petition creating the restriction; and

(6) if the amendment or modification of a restriction is proposed, a copy of the proposed instrument creating the amendment or modification, containing the original restriction that is affected and indicating by appropriate deletion and insertion the change to the restriction that is proposed to be amended or modified.

(c) Each member of the committee must sign and acknowledge the notice before a notary or other official authorized to take acknowledgments.

(d) The county clerk shall enter on the notice the date it is filed and record it in the real property records of the county.

**\*131** (e) An individual's membership on the committee terminates if the individual ceases to own land in the subdivision. If a vacancy on the committee occurs, either because a member ceases to own land in the subdivision or because a member resigns or dies, a majority of the remaining members may appoint as a successor an individual who owns land in the subdivision and who consents to serve as a committee member. If one or more successor committee members are appointed, the surviving committee members shall file written notice of the name and address of each successor committee member with the county clerk not later than the 10th day after the date of the appointment.

(f) After August 31, 1989, only one committee in a subdivision may file to operate under this chapter at one time. Before September 1, 1989, there is no limit on the number of committees in a subdivision with power to act under this chapter at one time. If more than one committee in a subdivision files a notice after August 31, 1989, the committee that files its notice first is the committee with the power to act. A committee that does not effect a successful petition within the time provided by this chapter is dissolved by operation of law. Except as provided by Section 201.006(c), a new committee for that subdivision may not be validly created under this chapter before the fifth anniversary of the

date of dissolution of the previous committee. A petition circulated by a dissolved committee is ineffective for any of the purposes of this chapter.

*Id.* § 201.005. Section 201.006, "Petition Procedure," provides:

> If, after August 31, 1988, a court of competent jurisdiction holds any provision of a restrictive covenant affecting a subdivision to which this chapter applies invalid, a petition committee authorized by this chapter may file a petition not later than one year after the date on which the judgment is rendered. For this purpose, the five-year limitation period in Section 201.005(f) does not apply.

*Id.* § 201.006(c).

Chapter 202, "Construction and Enforcement of Restrictive Covenants," "applies to all restrictive covenants regardless of the date on which they were created." *Id.* § 202.002(a). For purposes of chapter 202:

> "Property owners' association" means an incorporated or unincorporated association owned by or whose members consist primarily of the owners of the property covered by the dedicatory instrument and through which the owners, or the board of directors or similar governing body, manage or regulate the residential subdivision, planned unit development, condominium or townhouse regime, or similar planned development.

*Id.* § 202.001(2). Also:

> "Dedicatory instrument" means each document governing the establishment, maintenance, or operation of a residential subdivision, planned unit development, condominium or townhouse regime, or any similar planned development. The term includes a declaration or similar instrument subjecting real property to:
>
> (A) restrictive covenants, bylaws, or similar instruments governing the administration or operation of a property owners' association;
>
> (B) properly adopted rules and regulations of the property owners' association; or
>
> (C) all lawful amendments to the covenants, bylaws, instruments, rules, or regulations.

**\*132** *Id.* § 202.001(1). Under section 202.006, "Public Records": "(a) A property owners' association shall file all dedicatory instruments in the real property records of each county in which the property to which the dedicatory instruments relate is located. (b) A dedicatory instrument has no effect until the instrument is filed in accordance with this section." *Id.* § 202.006.

Chapter 204, "Powers of Property Owners' Association Relating to Restrictive Covenants in Certain Subdivisions," applies to residential real estate subdivisions located "in a county with a population of 3.3 million or more" and "to a restriction regardless of its effective date." *Id.* § 204.002(a)(1), (b). Section 204.004, "Property Owners' Association," provides that a POA "is a designated representative of the owners of property in a subdivision," whose membership "consists of the owners of property within the subdivision." *Id.* § 204.004(a). The POA must be nonprofit. *Id.* § 204.004(b). Under section 204.006, "Creation of Property Owners' Association":

> (a) If existing restrictions applicable to a subdivision do not provide for a property owners' association and require approval of more than 60 percent of the owners to add to or modify the original dedicating instrument, a petition to add to or modify the existing restrictions for the sole purpose of creating and operating a property owners' association with mandatory membership, mandatory regular or special assessments, and equivalent voting rights for each of the owners in the subdivision is effective if:

(1) a petition committee has been formed as prescribed by Section 201.005;

(2) the petition is approved by the owners, excluding lienholders, contract purchasers, and the owners of mineral interests, of at least 60 percent of the real property in the subdivision; and

(3) the procedure employed in the circulation and approval of the petition to add to or amend the existing restrictions for the specified purpose complies with the requirements of this chapter.

(b) If the circulated petition is not approved by the required percentage of owners within one year of the creation of the petition committee, the petition is void and another petition committee may be formed.

(c) If the petition is approved, the petition is binding on all properties in the subdivision or section, as applicable.

*Id.* § 204.006. Section 204.010, "Powers of Property Owners' Association," among other things, provides that the POA acting through its board of directors or trustees may "adopt and amend bylaws;" "institute, defend, intervene in, settle, or compromise litigation or administrative proceedings on matter affecting the subdivision;" and "collect reimbursement of actual attorney's fees and other reasonable costs incurred by the property owners' association relating to violations of the subdivision's restrictions or the property owners' association's bylaws and rules." *Id.* § 204.010(1), (4), (11).

**2. Declarations one and two: invalidity of July 2001 notice of formation of petition committee and June 2002 petition**
There is no dispute that three property owners in the Subdivision filed a notice of formation of petition committee in May 2000, wherein they attempted to create a committee pursuant to sections 201.005 and 204.006 of the Property Code to modify the Subdivision's deed restrictions for the creation and operation of a POA. There is also no dispute that this committee did not pass a petition within one year **\*133** and thereafter was dissolved by operation of law.

Even though GOMO does not directly challenge declaration one,[11] we discuss it because of its interplay with declaration two. In its final judgment, the trial court declared:

> The Notice of Formation of Petition Committee filed on July 23, 2001 under Harris County Clerk's File No. V191699 (and the amendment attached thereto) is invalid, ineffective, and of no force and effect with respect to Defendants Peter S. Chang and Katherine M. Chang.

According to the Changs, the July 2001 notice of formation of petition committee was invalid, ineffective, and of no force and effect because the timing of the formation of this new committee did not comply with section 201.005(f). We agree.

In July 2001, three different property owners in the Subdivision filed a notice of formation of petition committee pursuant to sections 201.005 and 204.006 of the Property Code, wherein the committee proposed to modify the deed restrictions for the creation and operation of a POA. Attached to the notice was "Amendment of Deed Restrictions Garden Oaks." To the extent that the July 2001 notice was filed pursuant to section 201.005, the plain language of section 201.005(f) provides that, except as provided in section 201.006(c),[12] a new committee may not be validly created under chapter 201 before the fifth anniversary of the date of the dissolution of the previous committee. *Id.* § 201.005(f). In other words, after the May 2000 committee dissolved in May 2001, the earliest another valid committee could have been formed under chapter 201 was May 2006. *See id.*

According to GOMO, however, it "is not arguing that it was formed under Chapter 201 on appeal" but instead under chapter 204, specifically, section 204.006.[13] GOMO contends that section 204.006 does not impose a five-year waiting period. Instead, based on its interpretation of section 204.006(b), GOMO asserts that it properly formed a new petition committee in July 2001, "after one year had passed from the creation of the petition committee." We disagree.

Section 204.006 states that if existing applicable restrictions do not provide for a POA and require approval of more than 60 percent of the owners to add to or modify **\*134** the original dedicating instrument, then a petition to add to or modify the existing restrictions "for the sole purpose of creating and operating a [POA] with mandatory membership, mandatory regular or special assessment, and equivalent voting rights for each of the owners in the subdivision is effective if ... a petition committee has been formed as prescribed by Section 201.005." *Id.* § 204.006(a)(1). One express requirement of section 201.005—namely, subsection (f)—is that a new petition committee (with one exception not at issue) may not validly be formed before the fifth anniversary of the dissolution of the prior committee. *Id.* § 201.005(f). Section 204.006 also provides that "[i]f the circulated petition is not approved by the required percentage of owners within one year of the creation of the petition committee, the petition is void and another committee may be formed." *Id.* § 204.006(b).

The plain meaning of section 204.006(b) is exactly what it states: if a petition is not approved within one year of the committee's formation, then the petition is void and another committee may be formed. The phrase "within one year of the creation of the petition committee" modifies "approved," describing the time frame within which the circulated petition needs to be approved—not the waiting period for forming a new petition committee. This (five-year) waiting period is already supplied within section 201.005; subsection (a)(1) provides that for purposes of section 204.006 a petition committee must be formed as "prescribed" or dictated by section 201.005. *See id.* §§ 201.005(f), 204.006(a)(1); Black's Law Dictionary 1373 (10th ed. 2014) ("prescribe" means "to dictate, ordain, or direct; to establish authoritatively (as a rule or guideline)").

Subsection (b) of section 204.006 does not state that another petition committee may be formed sooner than otherwise provided for in section 201.005. Subsection (b) does not provide that a different, shorter limitation period applies to the formation of "another petition committee." Nor does any language within section 204.006 indicate that formation of the petition committee need only comply with certain requirements of section 201.005. Nothing within section 204.006 provides that the waiting-period requirement of section 201.005(f) does not apply. We must take statutes as we find them, presuming the legislature included words that it intended to include and omitted words it intended to omit. *See Union Carbide Corp. v. Synatzske*, 438 S.W.3d 39, 52 (Tex. 2014). We may not, as GOMO would have us do, read language into the statute that the legislature did not choose to include or move language around to modify another part of the provision.

To interpret section 204.006(b) as GOMO desires not only goes against the plain, unambiguous language of the provision, but also impermissibly would render meaningless or superfluous the language in section 204.006(a)(1) that requires a petition committee be formed in accordance with section 201.005, as well as the language in section 201.005(f) imposing a five-year limitation period before a new petition committee can be validly created. *See Crosstex Energy Servs, L.P. v. Pro Plus, Inc.*, 430 S.W.3d 384, 390 (Tex. 2014). The literal language of the statute can be viewed as a legislative attempt to require a rather significant amount of time to pass before petition committees can re-form to alter the governance and restrictions applicable to subdivisions. Moreover, in circumstances where the legislature has determined that a shorter waiting period is appropriate, *e.g.*, when a court has held a restriction to be invalid, the legislature has utilized statutory language expressly reflecting such intent. *See* Tex. Prop. Code Ann. § 201.006(c) ("For this purpose, the **\*135** five-year limitation period in Section 201.005(f) does not apply.").

The record reflects that, in July 2001, there was an attempt to form a new petition committee just months—instead of at least five years—after the dissolution of the previous May 2000 petition committee. The July 2001 petition committee was not validly formed either under section 201.005 or 204.006. Therefore, the July 2001 notice of formation, as well as the attached amendment exhibit, was invalid and had no effect as to the Changs,[14] and we conclude that the trial court did not err in rendering declaration one.

In its final judgment, the trial court then rendered declaration two:

The Petition to Amend Restrictions filed on June 3, 2002, under Harris County Clerk's File No.
V842579 is ineffective and of no force and effect with respect to Defendants Peter S. Chang or
Katherine M. Chang.

The June 2002 petition sought to establish GOMO as the POA for the Subdivision, with the powers in the amendment
exhibit and in chapter 204. The June 2002 petition specifically invoked section 204.006 and stated that the petition
committee was formed by recording the July 2001 notice of formation. To properly effect a petition under section 204.006
requires proper formation of a petition committee under section 201.005. *Id.* § 204.006(a)(1). Having already determined
that the July 2001 petition committee was not validly created under section 201.005(f) and the filed notice of formation
accordingly was invalid and had no effect, we conclude that the June 2002 petition likewise was ineffective as to the
Changs. Therefore, we conclude that the trial court did not err in rendering declaration two.


   **3. Declaration three: GOMO's bylaws have no force and effect**
 **[10]**   GOMO also challenges the trial court's third declaration: "The By-Laws of Garden Oaks Maintenance
Organization have no force and effect against Defendants Peter S. Chang or Katherine M. Chang." In their motion for
declaratory judgment, the Changs took the position that because GOMO's bylaws were not on file with the real property
records of Harris County, the bylaws had no force and effect under section 202.006. In its order on the Changs' motion
for declaratory relief and for final judgment, the trial court stated, "There is no evidence that GOMO has filed its bylaws
in the real property records of Harris County." GOMO argues that the Changs did not meet their burden of proof.

Because they requested the declaration, the Changs bore the burden to establish that the bylaws were not filed in the
property records. *See Vaughn*, 448 S.W.3d at 129 n.11. Assuming without deciding that GOMO's bylaws, which are not
included in the record, meet the definition of a dedicatory instrument required to be filed, [15] the **\*136** Changs did not
establish that any such bylaws were not filed.

In the "By-Laws" section of their motion, the Changs cited GOMO's management certificate. The subdivision
management certificate filed in May 2010 lists recording data for the Subdivision and for the Subdivision's deed
restrictions. *See* Tex. Prop. Code Ann. § 209.004(a)(3)–(4) (West 2014 & Supp. 2016) ("Management Certificates").
The certificate does not list any recording data for GOMO's bylaws. On appeal, the Changs also point to testimony by
GOMO's representative Weltin:

   Q. (BY MR. LAMBRIGHT) Are the bylaws filed with the real property records?

   A. I don't have personal knowledge of that.

   Q. Do they show on the management certificate?

   A. On this particular management certificate, which again I'm only generally aware of, I don't see a reference to them.

   ...

   Q. Why did you just tell the ladies and gentlemen of the jury it gave you authority?

   A. Under this document we have authorities under 204.010 and 204.006 because I've read that, plain languages, in
   terms of what it gives us authority under.

   Q. And neither of those two give you any enforcement authority, do they?

   A. They allow us to create a homeowners' association and create bylaws, and those bylaws specifically in this document
   allow us to enforce the deed restrictions.

In addition, when asked, "You don't have bylaws filed in the real property records to give anyone notice, do you?" Weltin answered, "I'm not sure. And I'm being honest. I'm not sure whether we filed them or not. I'm not aware." Weltin also said he did not know "one way or the other, to be honest" and that he "would have to go back and search the real property records." According to Weltin, GOMO's bylaws were posted on GOMO's website, "have been online for 10 years," and were "widely circulated" and "generally available."

The May 2010 management certificate does not prove that GOMO's bylaws were not recorded in the real property records. *See id.* § 209.004(a) (listing what POA is required to state in management certificate and not expressly listing recording data for POA's bylaws). Weltin also indicated that GOMO possibly filed "a subsequent" certificate. *See id.* § 209.004(b) (POA shall file amended management certificate within 30 days of change in information required by subsection (a)). In addition, Weltin's not being able to testify based on a lack of personal knowledge or stating that he was "not sure" or "not aware" and would have to check whether the bylaws were filed does not constitute evidence that they were not filed, which is what the Changs needed to prove to be entitled to their declaration. That is, instead of there being "no evidence that  **\*137**  GOMO has filed its bylaws," as the trial court concluded, to support the declaration, there needed *to be* evidence that GOMO *did not* file its bylaws. [16]

Because the Changs did not meet their burden to prove that GOMO did not file its bylaws in the real property records on Harris County as of the date of suit (or otherwise), we conclude the trial court erred in declaring that GOMO's bylaws have no force and effect against the Changs.

### 4. Declaration four: GOMO's lack of authority or standing to pursue legal action against the Changs for violations of deed restrictions

**[11]**  Lastly, GOMO challenges the trial court's fourth declaration:

> Garden Oaks Maintenance Organization has no authority or standing to pursue any legal action against Defendants Peter S. Chang or Katherine M. Chang for violations of any alleged deed restrictions in the Garden Oaks Section Three.

**[12]**  This declaration means that GOMO lacks both the standing [17] and authority to bring any legal action against the Changs for violations of the deed restrictions. "Standing is not to be confused with capacity" because standing concerns whether a party has an enforceable right or interest and capacity concerns a party's authority to come into court. *Rodarte v. Investeco Group, L.L.C.*, 299 S.W.3d 400, 406–07 (Tex. App.—Houston [14th Dist.] 2009, no pet.); *Nootsie, Ltd. v. Williamson Cty. Appraisal Dist.*, 925 S.W.2d 659, 661 (Tex. 1996) ("A plaintiff has *standing* when it is personally aggrieved, regardless of whether it is acting with legal authority; a party has *capacity* when it has the legal authority to act, regardless of whether it has a justiciable interest in the controversy.").

With regard to standing, in their motion for declaratory judgment, the Changs simply argued that by virtue of the invalidity of the July 2001 notice of formation of petition committee, the June 2002 petition, and the amendment exhibit, GOMO's "standing to enforce the existing covenants simply does not exist." Nor did the trial court in its order on the Changs' motion provide any specific analysis regarding GOMO's standing.

**[13]**    **[14]**  Standing is a necessary component of subject-matter jurisdiction and is determined at the time suit is filed in the trial court. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 445–46 (Tex. 1993). An association has standing to sue when it satisfies a three-prong test: (1) the members must otherwise have standing to sue in their own right; (2) the interests it seeks to protect must be germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested may require the participation of individual members in the lawsuit. *See id.* at 447.

[15]   **\*138**   The first requirement "should not be interpreted to impose unreasonable obstacles to associational representation." *Id.* "Ordinarily, any person entitled to benefit under a restrictive covenant may enforce it." *Anderson*, 122 S.W.3d at 384. "[G]enerally, an interested property owner may enforce a restrictive covenant." *Id.* at 384–85 (citing *Giles v. Cardenas*, 697 S.W.2d 422, 427 (Tex. App.—San Antonio 1985, writ ref'd n.r.e.)). The record reflects that GOMO is a Texas nonprofit corporation whose members include property owners in the Subdivision. Under the deed restrictions for the Subdivision, "[t]he owner of any lot or lots affected shall have the right either to prevent a breach of any such restriction, covenant, or condition or to enforce performance of same." GOMO members, as property owners, would have standing to bring this suit to enforce deed restrictions. *See id.* at 385. GOMO satisfies the first requirement for standing as an association. *See id.*

The record reflects that the primary purpose of GOMO "is to make sure that the neighborhood integrity is well maintained and that everyone consistently follows deed restrictions." Because the interests GOMO seeks to protect in its suit are germane to the organization's purpose, it satisfies the second prong of the test. *See Tex. Ass'n of Bus.*, 852 S.W.2d at 447–48; *Anderson*, 122 S.W.3d at 385.

Finally, the claims GOMO asserts and the relief it requests do not require the participation of any individual members. *See Anderson*, 122 S.W.3d at 385. Where, as here, an association seeks injunctive relief, it is reasonable to suppose that the relief sought will inure to the benefit of the injured members. *See Tex. Ass'n of Bus.*, 852 S.W.2d at 448; *Anderson*, 122 S.W.3d at 385. GOMO did not need to prove the individual circumstances of its members to obtain such relief. *See Tex. Ass'n of Bus.*, 852 S.W.2d at 448; *Anderson*, 122 S.W.3d at 385. Having met all three requirements, we conclude that GOMO, as an association, had standing to bring suit against the Changs for the purported garage deed-restriction violation. Therefore, the trial court erred in declaring that GOMO has no standing.

[16]   With regard to authority, in their motion for declaratory judgment, the Changs argued that GOMO lacked authority to enforce the deed restrictions against them because of the invalidity of the July 2001 notice, the June 2002 petition, and the amendment exhibit. We already have determined that the trial court properly could render declarations one and two. Therefore, GOMO could not rely on its creation as a POA under sections 201.005 and 204.006 for its capacity to sue.

[17]   GOMO, however, argued two other sources for its authority to sue to enforce the deed restrictions: (1) under its bylaws and (2) based on section 202.004(b). [18] The Changs did not prove that GOMO did not file its bylaws and, as **\*139** we already concluded, were not entitled to any declaration that the bylaws have no force and effect against the Changs. In their motion for declaratory judgment, the Changs did not present any argument that GOMO lacked authority under section 202.004(b). [19] And even though the trial court acknowledged in its order that GOMO believed it had "legal authority to enforce the deed restrictions under § 202.004(b)," the trial court did not discuss or analyze, much less determine, whether GOMO had such section-202.004(b) authority. *See* Tex. Prop. Code Ann. § 202.004(b) (West 2014) ("A property owners' association or other representative designated by an owner of real property may initiate, defend, or intervene in litigation or an administrative proceeding affecting the enforcement of a restrictive covenant or the protection, preservation, or operation of the property covered by the dedicatory instrument."); *see also id.* § 202.001(2) (defining POA as "an incorporated or unincorporated association owned by or whose members consist primarily of the owners of the property covered by the dedicatory instrument and through which the owners, or the board of directors or similar governing body, manage or regulate the residential subdivision, planned unit development, condominium or townhouse regime, or similar planned development" for purposes of chapter 202).

[18]   "[U]nlike standing, objections concerning capacity may be waived." *Rodarte*, 299 S.W.3d at 407 n.3 (citing *Nootsie*, 925 S.W.2d at 662). Even assuming without deciding the Changs preserved any capacity objection based on section 202.004(b), they argue on appeal that GOMO "would not have the authority to hold itself out as a [POA] as defined by § 202 [ ] until it had already cleared the legislative hurdles set out by § 201 and § 204." The Changs point to, and we have located, nothing within the statutory scheme that first would require a POA to be created under section 204.006

(and meet section 201.005) before it otherwise could meet chapter 202's definition of a POA. Both chapters 202 and 204 provide their own distinct definition of a POA. *Compare* Tex. Prop. Code Ann. § 202.001(1), *with id.* § 204.004. Nor does chapter 204 cross-reference chapter 202's POA definition. *Cf. id.* § 204.001(1), (2) (cross-referencing certain definitions from chapters 201 and 202). [20]

**\*140**  The Changs also argue because GOMO chose not to challenge the jury's findings that the deed restrictions had been waived and abandoned, and that GOMO's attempted enforcement was arbitrary and capricious, GOMO's "ability to enforce the restrictions under § 202 is irrelevant to the Final Judgment." First, we note that the jury's findings did not reach all the deed restrictions, but rather were expressly limited to "the deed restriction in question"—the garage deed restriction. Moreover, it was the Changs who bore the burden on declaratory judgment to prove that GOMO lacked authority to pursue legal action against the Changs for violations of any deed restrictions. *See Vaughn,* 448 S.W.3d at 129 n.11. GOMO's decision not to appeal the jury's findings on the Changs' affirmative defenses of waiver, abandonment, and arbitrary/capricious enforcement as to alleged violations of *one* deed restriction does not render "irrelevant" GOMO's appellate challenge of whether the Changs met their burden to entitle them to declaratory relief on *all* lack of authority. Because we conclude the Changs did not meet this burden, the trial court erred by declaring that GOMO has no authority.

We sustain GOMO's second issue, in part, with regard to declarations three and four.

### C. The Changs' cross-appeal on their attorney's fees

**[19]   [20]**  In their cross-appeal, the Changs first contend that attorney's fees were proper under section 5.006 of the Property Code. Section 5.006 provides that "[i]n an action based on [a] breach of a restrictive covenant pertaining to real property, the court shall allow [the] prevailing party who asserted the action reasonable attorney's fees in addition to the party's costs and claim." Tex. Prop. Code Ann. § 5.006(a) (West 2014). If breach of a restrictive covenant is properly pleaded and proved, then the award of fees under section 5.006 is mandatory. *See id.*; *Mitchell v. LaFlamme,* 60 S.W.3d 123, 130 (Tex. App.—Houston [14th Dist.] 2000, no pet.). However, only a party that successfully prosecutes its claim alleging a breach of a restrictive covenant is entitled to an award of attorney's fees under section 5.006. *Castille,* 2017 WL 3910918, at \*9; *Tanglewood,* 436 S.W.3d at 73; *Anderson,* 122 S.W.3d at 390. A party that successfully defends a cause of action for breach of a restrictive covenant is not able to recover fees under the statute. *Castille,* 2017 WL 3910918, at \*9 (citing *Indian Beach,* 222 S.W.3d at 706 n.1; *City of Pasadena v. Gennedy,* 125 S.W.3d 687, 700–01 (Tex. App.—Houston [1st Dist.] 2003, pet. denied); and *Pebble Beach Prop. Owners' Ass'n v. Sherer,* 2 S.W.3d 283, 291–92 (Tex. App.—San Antonio 1999, pet. denied)).

**[21]**  GOMO asserted claims for breach of restrictive covenant and pleaded for its attorney's fees under section 5.006. The Changs asserted counterclaims for declaratory relief and pleaded for their attorney's fees under section 37.009. Because the Changs did not assert, but only defended, claims for breach of restrictive covenant, they are not entitled to attorney's fees under section 5.006. Therefore, the trial court did not err in refusing to grant them attorney's fees under section 5.006.

**[22]   [23]   [24]**  Next, the Changs challenge the trial court's refusal to award their attorney's fees under section 37.009 of the Act. *See* **\*141** Tex. Civ. Prac. & Rem. Code Ann. § 37.009. Section 37.009 provides that the trial court may award costs and reasonable and necessary attorney's fees as are equitable and just. *Id.* As such, the statute affords the trial court a measure of discretion in deciding whether to award attorney's fees. *Bocquet v. Herring,* 972 S.W.2d 19, 20 (Tex. 1998). "[I]n exercising its discretion in a declaratory-judgment action, a trial court may award attorney's fees to the prevailing party, may decline to award attorney's fees to either party, or may award attorney's fees to the nonprevailing party, regardless of which party sought declaratory relief." *Castille,* 2017 WL 3910918, at \*11. Therefore, we do not disturb an award or denial of attorney's fees under the Act absent a showing of abuse of discretion by the trial court. *Georgiades v. Di Ferrante,* 871 S.W.2d 878, 882 (Tex. App.—Houston [14th Dist.] 1994, writ denied). The trial court only abuses its discretion when it acts without reference to any guiding rule or principles. *Worford v. Stamper,* 801 S.W.2d 108, 109 (Tex. 1990).

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

In its order, the trial court stated that the Changs' request for attorney's fees under section 37.009 should be denied "for the reasons articulated by GOMO in opposition to the Changs' request for an award of attorney['s] fees." GOMO's response to the Changs' brief and motion for declaratory relief and for final judgment argued various grounds for the trial court to deny the Changs their attorney's fees under the Act. GOMO argued that the Changs should not be awarded their fees due to their "defensive use" of the Act and because they did not segregate their fees. GOMO further argued that the trial court should not exercise its discretion to award fees under the Act where the case presented a "very close call"; GOMO had the responsibility to and was "reasonable in filing suit" to enforce the Subdivision's deed restrictions; and the Changs had not shown "equitable" or "honest" behavior by misleading the board and covertly changing their garage plans.

On appeal, the Changs entirely focus on segregation, arguing GOMO waived lack of segregation by not objecting before the verdict and the Changs submitted evidence that sufficiently detailed segregation of their claims. Even assuming without deciding that the parties' briefing otherwise sufficiently raised and addressed the "defensive use" ground for refusal to award attorney's fees, however, the Changs do not present any argument whatsoever attacking the additional ground that their fees were not equitable or just. *See Britton v. Tex. Dep't of Criminal Justice*, 95 S.W.3d 676, 681 (Tex. App.—Houston [1st Dist.] 2002, no pet.) ("Generally speaking, an appellant must attack all independent bases or grounds that fully support a complained-of ruling or judgment."). Because the Changs assign no error to this independent ground that would fully support the trial court's refusal to award section-37.009 attorney's fees, we must accept the validity of this ground and affirm. *See id.*

Moreover, under circumstances where the declaratory-judgment claims presented issues of apparent first impression requiring statutory interpretation and where one side committed a breach but the other side's behavior excused that breach, we conclude the trial court properly could have determined that awarding the Changs attorney's fees under the Act was not equitable or just and therefore did not abuse its discretion. *See Anglo–Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 522 S.W.3d 471, 494–95, 497 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (trial court properly refused to award any section-37.009 attorney's fees where circumstances revealed both sides engaged in unjust and inequitable conduct).

We overrule the Changs' cross-issue.

## *142  III. CONCLUSION

The trial court properly considered the Changs' counterclaims for declaratory relief and did not err in making its first two declarations. The trial court did not abuse its discretion in refusing to award the Changs their attorney's fees. However, the trial court erred in declaring that GOMO's bylaws have no force and effect with respect to the Changs and in declaring that GOMO has no authority or standing to pursue legal action against the Changs for violations of any of the Subdivision's deed restrictions. Accordingly, we modify the trial court's final judgment to delete declarations three and four. As modified, the trial court's judgment is affirmed.

## All Citations

542 S.W.3d 117

## Footnotes

1    GOMO does not challenge any of the jury's findings on appeal.

2    With regard to both of its issues, in its prayer for relief GOMO only requests reversal of declarations two through four. When asked during oral argument, however, GOMO answered that it also seeks reversal of declaration one.

3    The *Anderson* opinion provides few, if any, substantive details about Anderson's declaratory-judgment counterclaim allegations, *e.g.*, whether Anderson requested particular declarations interpreting and determining the parties' right or status under the assignment document or the Property Code.

4    The record reflected that, after NPOAN filed suit, amendments to the deed restrictions applicable to the subdivision were recorded—establishing NPOAN as the POA with authority to enforce deed restrictions. *Anderson*, 122 S.W.3d at 386, 388.

5    In *Tanglewood*, property owners the Feldmans brought suit against the Tanglewood POA for various causes of action after the POA rejected the Feldmans' house-expansion plans. 436 S.W.3d at 56. On the fifth day of trial, the Feldmans requested and the trial court approved a trial amendment to add a declaratory-judgment action that the plans complied with the deed restrictions. *See id.* at 58–59. The trial court entered judgment on the verdict in favor of the Feldmans and awarded them attorney's fees. *Id.* at 59–60. On appeal, our court concluded that the trial court did not abuse its discretion in granting the trial amendment and did not err in granting declaratory relief. *Id.* at 64–68. However, we concluded that awarding declaratory-judgment attorney's fees was improper because the record expressly reflected the Feldmans only sought the trial amendment to obtain attorney's fees. *Id.* at 69–70.

Only a nonprecedential portion of *Tanglewood* included any discussion of duplication of issues. *Id.* at 70 n.11, 70–72 (per J. Busby). Even if this portion were binding, it is distinguishable because the declarations there focused on "present compliance" of the house-expansion plans with the deed restrictions and in any event the injunctive relief covered any "future operation." *Id.* at 71 (per J. Busby).

6    In *Texan Land and Cattle*, we concluded the trial court did not err in denying attorney's fees under section 37.009 of the Act where both the plaintiff property owner's inverse-condemnation claim and its request for declarations concerned access to the property via a particular street and where it appeared that the only additional remedy sought by the declaratory-judgment action was fees. 138 S.W.3d at 392 & n.7.

7    The additional cases on which GOMO relies in its reply brief also are unpersuasive. *See Washington Square Fin., LLC v. RSL Funding, LLC*, 418 S.W.3d 761, 775–76 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (neither plaintiff alleging tortious interference nor defendant raised declarations that had "greater ramifications" than tortious-interference claim); *Wells v. Lomita Subdivision*, No. 13-07-070-CV, 2008 WL 1901672, at *5 & n.5 (Tex. App.—Corpus Christi Apr. 29, 2008, no pet.) (mem. op.) (property owners' declaratory-judgment counterclaims were "virtually identical" to and merely restated their defenses regarding waiver, unclean hands, and arbitrary, capricious, and discriminatory enforcement); *Noell v. Air Park Homeowners Ass'n, Inc.*, 246 S.W.3d 827, 836 (Tex. App.—Dallas 2008, pet. denied) (no injury or ripening controversy regarding construction of road where homeowner requesting construction was not sued and road at issue already had been constructed).

8    GOMO did not rely on *Etan* in the trial court. In its brief, GOMO included *Etan* in a string cite in its discussion of the law. GOMO discussed the application of *Etan* during oral argument.

9    *See supra* n.2.

10   The appellate record does not contain any reporter's record from this hearing.

11   In its reply brief, GOMO asserts that declaration one only indicates the current state of the July 2001 petition committee as not being in existence any longer and does not state that the July 2001 petition committee was improperly formed. We disagree. The declaration provides exactly what it states—that the filed notice of formation of petition committee and amendment exhibit attached are invalid, ineffective, and of no force and effect with respect to the Changs.

12   There is no contention that the July 2001 petition committee was formed under the circumstances covered in section 201.006(c), *i.e.*, that a court had held any provision of the deed restrictions invalid within the prior year. *See* Tex. Prop. Code Ann. § 201.006(c).

13   In the trial court, the Changs also argued and the trial court agreed that GOMO could not validly be formed pursuant to section 204.006 because the existing deed restrictions did not require approval of more than 60 percent of the owners to add to or modify the original dedicating instrument, *see* Tex. Prop. Code. § 204.006(a), and because the petition was not for the sole purpose of creating and operating a POA with mandatory membership, mandatory regular or special assessments, and equivalent voting rights for each of the owners, *see id.* On appeal, GOMO argues that it met all the requirements of section 204.006(a). Because we conclude that declarations one and two are sustainable based on improper formation of the petition committee under both sections 201.005 and 204.006, we need not address these additional theories of invalidity. *See* Tex. R. App. P. 47.1; *Tanglewood*, 436 S.W.3d at 66.

14    In the trial court GOMO filed an emergency motion to abate the proceedings for the Changs to serve all the property owners in the Subdivision as necessary parties to the Changs' declaratory-judgment counterclaims. The trial court denied GOMO's motion. On appeal, GOMO does not challenge this ruling or reurge its joinder argument.

15    The trial court in its order concluded that a POA's bylaws are a "dedicatory instrument" under chapter 202. *See Goddard v. Northhampton Homeowners Ass'n, Inc.*, 229 S.W.3d 353, 358 (Tex. App.—Amarillo 2007, no pet.) (set of recorded bylaws was "viewed collectively" with "all of the dedicatory instruments" (citing Tex. Prop. Code § 202.001(1))). *But see Storck v. Tres Lagos Prop. Owners Ass'n, Inc.*, 442 S.W.3d 730, 738 (Tex. App.—Texarkana 2014, pet. denied) (agreeing with trial court that "Association's bylaws are not a dedicatory instrument as defined in this section of the Property Code" (citing definition of "dedicatory instrument" in Tex. Prop. Code § 209.002(4))); *see also* Tex. Prop. Code Ann. § 209.002(4) (West 2014 & Supp. 2016) (" 'Dedicatory instrument' means each governing instrument covering the establishment, maintenance, and operation of a residential subdivision. The term includes restrictions or similar instruments subjecting property to restrictive covenants, bylaws, or similar instruments governing the administration or operation of a property owners' association, to properly adopted rules and regulations of the property owners' association, and to all lawful amendments to the covenants, bylaws, rules, or regulations.").

16    The Changs did not present an affidavit or other evidence of any review or search of the real property records in Harris County resulting in the conclusion that GOMO failed to file its bylaws. *See Shelton v. Kalbow*, 489 S.W.3d 32, 53 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (review of real property records provided adequate underlying basis for abstractor's conclusion in her affidavit).

17    If the trial court's declaration that GOMO lacks standing with respect to the Changs were correct, then the trial court would not have had subject-matter jurisdiction to decide GOMO's claims and render a take-nothing judgment in favor of the Changs. *See Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443–44 (Tex. 1993); *see also DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 304 (Tex. 2008) ("Without jurisdiction, the trial court should not render judgment that the plaintiffs take nothing; it should simply dismiss the case.").

18    Texas courts have held that an association may have capacity to sue under section 202.004(b) as a designated representative where the association was not (or was not yet) validly created as a POA through the amendment procedure under the Property Code, *e.g.*, under section 204.006. *See Summers v. Highland Composite Prop. Owners Ass'n, Inc.*, 363 S.W.3d 210, 213–14 (Tex. App.—Corpus Christi 2011, no pet.); *see also Anderson*, 122 S.W.3d at 388. An entity meeting the definition of a POA under chapter 202 also has capacity to sue under section 202.004(b). *See* Tex. Prop. Code Ann. §§ 202.001(2), 202.004(b); *cf. Hawkins v. Walker*, 233 S.W.3d 380, 388 & n.8, 389 & n.16, 390 (Tex. App.—Fort Worth 2007, no pet.) (individual property owners did not purport to be POA or designated representatives and did not have capacity to sue (citing sections 202.001(2) and 202.004(b)).

19    The Changs take the position that GOMO impermissibly first raised the applicability of "§ 202" on appeal. The Changs also contend that GOMO's pleading "did not indicate that it sued in any representative capacity." We disagree. In its live pleading, GOMO repeatedly referenced "Plaintiff and the property owners in the Subdivision" in its allegations pertaining to injunctive relief. GOMO specifically requested relief in the form of damages pursuant to subsection (c) of section 202.004, "Enforcement of Restrictive Covenants." Although GOMO did not expressly state whether it was relying on its authority as a chapter-202 POA or as a representative designated by owners of real property under section 202.004, the record does not reflect that the Changs filed special exceptions. Absent special exceptions, we construe a pleading liberally in favor of the pleader. *See Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 81 (Tex. 2000); *see also Rodarte*, 299 S.W.3d at 413–14 (Frost, J., concurring) ("Well-timed special exceptions to [ ] trial-court pleading would have clarified the capacity issue."). Moreover, GOMO specifically directed the trial court to the applicability of section 202.004(b) during a hearing outside the jury's presence in response to the Changs' argument that GOMO lacked authority as a matter of law. GOMO also relied on section 202.004(b) as a source for its authority in its response to the Changs' motion for declaratory relief.

20    The Changs rely on *Gillebaard*. However, *Gillebaard* addressed the procedures for amending deed restrictions pursuant to petition under sections 204.005 and 204.006—not whether a POA first had to be created under section 204.006 before it could meet the definition of a POA under chapter 202 for purposes of capacity to sue. *See* 263 S.W.3d at 344, 348–352.

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

## **EXHIBIT B**

**June 2002 Petition**

*Exhibit A*
**Amendment of Deed Restrictions**
**Garden Oaks**

Every owner ("Owner" or "Owners") of a Parcel (as defined below) within the following sections of Garden Oaks, each being a subdivision in Harris County, Texas, according to the map or plat thereof recorded in the Map Records of Harris County, Texas, at the volume and page as shown below (collectively, the "Subdivision") will, solely by virtue of ownership and without further action, be a member of Garden Oaks Maintenance Organization, Inc., a Texas non-profit corporation (the "Organization"):

| Section | Volume | Page |
|---------|--------|------|
| One     | 14     | 5    |
| Two     | 15     | 4    |
| Three   | 15     | 71   |
| Four    | 1163   | 24   |
| Five    | 19     | 19   |

The Organization will act solely to further the common interests of the Subdivision and will be operated and governed as follows:

1.    <u>Membership</u>.   Each Parcel will have one vote in the Organization, regardless of the number of Owners of a Parcel.

It is recognized that the building sites currently existing throughout the Subdivision consist, as the case may be, of one platted lot, less than one platted lot, more than one platted lot, or portions of two or more platted lots and that an equitable allocation of voting rights must be made on a basis other than platted lots. A "Parcel" is therefore defined as the land comprising a single building site for a residence or residences, without regard to (a) how the lot(s) are shown on the applicable subdivision map or plat, or (b) whether or not there are structures currently existing on the Parcel.

A Parcel is entitled to two votes only if all of the following conditions are satisfied: (a) applicable City of Houston subdivision ordinances would permit subdivision of the Parcel by replatting, (b) each resulting Parcel would satisfy the frontage requirements imposed by the deed restrictions applicable to the section of the Subdivision in which the Parcel is located, (c) no structure that is located on one resulting Parcel would encroach onto the adjacent resulting Parcel or violate setback lines after subdivision (e.g., a building may not be located on the original Parcel such that the lot line created by the subdivision would, with respect to existing buildings, result in an encroachment or violation of setback lines), and (d) each resulting Parcel may be conveyed to a separate owner as a fee simple tract of land.

If there is more than one Owner of a Parcel, the vote of each Owner is required, and the vote of each Owner must be the same for a vote to be counted unless the Owner casting the vote represents to the Organization that he or she is authorized to vote on behalf of all the Owners. If the votes of the Owners of a Parcel conflict or are not the same, no vote will be counted for that Parcel.

Votes may be cast by written proxy if the original proxy is delivered to the Organization at or before the time of voting. Proxies may not be effective for a period exceeding eleven months.

Owners may be represented at a meeting for voting purposes by an attorney-in-fact pursuant to a power of attorney satisfying the requirements of Texas law if the following are delivered to the Organization at or before the time of voting: a copy of the power of attorney; a written statement by the attorney-in-fact that the power of attorney is valid, continuing, and has not been revoked; and the current address, phone number, and contact person, if an entity, in order to contact the Owner.

No Owner will have the right to vote unless (a) the Owner is shown on the membership rolls of the Organization, or (b) the recorded deed evidencing ownership of the Parcel and the address and phone number of the Owner have been delivered to the Organization.

2.    Powers of the Organization. Except for the Prohibited Actions (as defined below), the Organization will have all powers:

   a.    of a non-profit corporation chartered by the State of Texas;
   b.    of a property owners association pursuant to Section 204.010 of the Texas Property Code (or amended or successor statute); and
   c.    to establish and assess mandatory assessments for the operation of the Organization as provided in Section 4 below.

3.    Prohibited Actions. The Organization may not (a) establish, assess, or collect a mandatory assessment of any kind, except the mandatory Transfer Assessments expressly provided in Section 4, below, or (b) impose a lien against any land in the Subdivision for non-payment of a Transfer Assessment.

4.    Transfer Assessments.

   a.    Purpose. The Organization may levy mandatory assessments for the funding of its operational expenses, including, but not limited to, enforcement of deed restrictions, liability insurance premiums, costs of litigation, and administrative expenses.

   b.    Transfer Assessments. When a Parcel is conveyed by one person to another (except in connection with the division of community property after a divorce or as the result of the death of an Owner), the new Owner is obligated to pay a one-time special assessment ("Transfer Assessment") equal to 0.75% of the greater of (a) the gross purchase price of the Parcel as shown on the closing statement, or (b) the appraisal of the Parcel as shown on the then-current records of the Harris County Appraisal District. The Transfer Assessment will be either (i) collected at closing of the conveyance by the escrow or closing agent, title company, or other person conducting the closing and forwarded to the Organization at: P.O. Box 924693, Houston, Texas 77292, or other address that has been designated by the Organization by notice recorded in the Harris County Real Property Records, or (ii) if no third party has conducted the closing, then paid by the new Owner to the Organization within thirty days of the date of the conveyance.

   c.    Enforcement. The Organization may enforce the Transfer Assessment by obtaining a judgment against the Owner who failed to pay the Transfer Assessment and may collect counsel fees and court and other litigation costs as part of the judgment. The Organization may not foreclose a judgment lien against any land in the Subdivision or against a homestead, wherever located, but may foreclose the judgment lien against other real or personal property of the person against whom the judgment is taken.

5.    Voluntary Contributions. The Organization may, at any time and from time to time, request that the Owners and residents of the Subdivision make a voluntary contribution ("Voluntary Contribution") to the Organization for the Organization's operational expenses or for other purposes. The Organization will notify the Owners of each request for a Voluntary Contribution, its intended use, and the due date.

Bylaws. The Organization is authorized to adopt Bylaws to: (a) implement the operation of the Organization; (b) provide procedures for enforcement of the deed restrictions applicable to the Subdivision; (c) provide voting procedures for meetings of the Organization and the election of the Board; (c) establish the officers of the Organization, including president, vice president, secretary, and treasurer; and (d) address other matters as are typically addressed in the Bylaws of a property owners association, including amendment of the Bylaws.

7.    Existing Restrictions. This Amendment creates a property owners association and imposes Transfer Assessments on the Parcels, but does not otherwise amend, modify, terminate, or change the use restrictions applicable to any Parcel by reason of the following restrictions recorded in the Harris County Real Property Records, each of which is ratified by the Owners of land located in a particular section who have executed this amendment instrument, to continue in full force and effect as to that section.

| Section | Film Code Number |
|---------|------------------|
| One     | 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      |
| Two     | 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      |
| Three   | 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      |
| Four    | 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      |
| Five    | 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      |

## **EXHIBIT C**

**Financial Statement FYE October 31, 2015**

Garden Oaks Maintenance Organization, Inc.
Houston, Texas

Financial Statements
October 31, 2015

**GARDEN OAKS MAINTENANCE ORGANIZATION, INC.**
**(A Texas Non-Profit Corporation)**

**Financial Statements**

**October 31, 2016**

# *Canady & Canady P.C.*

### *Certified Public Accountants*
**4707 Ingersoll St.**
**Houston, TX  77027**
**713-783-1021 Fax 713-783-6770**
*www.canadycanady.com*

### <u>Independent Auditor's Report</u>

To the Board of Directors of
**Garden Oaks Maintenance Organization, Inc.**

### *Report on the Financial Statements*

We have audited the accompanying financial statements of Garden Oaks Maintenance Organization, Inc., which comprise the statement of assets and liabilities arising from cash transactions as of October 31, 2016, and the related statement of revenue collected and expenses paid for the year then ended, and the related notes to the financial statements.

### *Management's Responsibility for the Financial Statements*

Management is responsible for the preparation and fair presentation of these financial statements in accordance with the cash basis of accounting described in Note 3; this includes determining that the cash basis of accounting is an acceptable basis for the preparation of the financial statements in the circumstances. Management is also responsible for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

### *Auditor's Responsibility*

Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

## Canady & Canady P.C.
### Certified Public Accountants
**4707 Ingersoll St.**
**Houston, TX  77027**
**713-783-1021 Fax 713-783-6770**
*www.canadycanady.com*

### Independent Auditor's Report (Continued)

To the Board of Directors of
**Garden Oaks Maintenance Organization, Inc. HOA, Inc.**

### *Opinion*

In our opinion, the financial statements referred to above present fairly, in all material respects, the assets and liabilities from cash transactions of Garden Oaks Maintenance Organization, Inc. as of October 31, 2016, and its revenue collected and expenses paid during the year then ended in accordance with the cash basis of accounting described in Note 3.

### *Basis of Accounting*

We draw attention to Note 3 of the financial statements, which describes the basis of accounting. The financial statements are prepared on the cash basis of accounting, which is a basis of accounting other than accounting principles generally accepted in the United States of America. Our opinion is not modified with respect to this matter.

*Canady & Canady P.C.*

Houston, Texas

July 20, 2017

## Garden Oaks Maintenance Organization, Inc.
## Statement of Assets and Liabilities Arising From Cash Transactions
## October 31, 2016

**Assets**

| | |
|---|---:|
| Cash and cash equivalent | 243,402 |
| Savings and investments | 85,225 |
| Capital assets (net of accumulated depreciation as an amount of $3,669) | 1,389 |
| **Total Assets** | |
| | $ 330,016 |

**Liabilities and Fund Balance**

| | |
|---|---:|
| Fund Balance | $ 330,016 |
| **Total Liabilities and Fund Balance** | $ 330,016 |

See accompanying notes to financial statements.

**Garden Oaks Maintenance Organization, Inc.**
**Statement of Revenues Collected and Expenses Paid**
**For the Year Ended October 31, 2016**

**Revenues**

| | | |
|---|---|---:|
| Transfer fees 1 | $ | 99,280 |
| Transfer fees 5 | | 64,968 |
| Transfer fees 3 | | 60,717 |
| Transfer fees 2 | | 47,602 |
| Interest | | 1,037 |
| **Total Revenues** | | 273,604 |

**Expenses**

| | |
|---|---:|
| Legal fees | 153,571 |
| Security | 153,484 |
| Maintenance | 20,124 |
| Professional fees | 16,443 |
| Rent | 11,400 |
| Insurance | 5,350 |
| Office and administrative | 4,033 |
| Miscellaneous | 3,455 |
| Computer and internet | 2,994 |
| **Total Expenses** | 370,854 |

| | |
|---|---:|
| **(Deficiency) of Revenues Over Expenses** | (97,250) |

**Fund Balance**

| | |
|---|---:|
| Beginning of year | 427,265 |
| End of year | $ 330,015 |

See accompanying notes to financial statements.

**Garden Oaks Maintenance Organization, Inc.**
**Notes to Financial Statements**
**October 31, 2016**

## Note 1 - Organization

Garden Oaks Maintenance Organization, Inc. (the Organization) was incorporated as a Texas non-profit corporation in September 30, 2002, to provide for the management, maintenance, preservation, and architectural control within Garden Oaks subdivisions 1, 2, 3 and 5, and to exercise all of the powers and privileges and to perform all of the duties and obligations of the Organization as set forth in the Declaration and Bylaws of the Organization. The Organization consists of 1,144 lots located in Houston, Texas.

## Note 2 - Date of Management's Review

In preparing the financial statements, the Organization has evaluated the events and transactions for potential recognition or disclosure through July 20, 2017, the date the financial statements were available to be issued.

## Note 3 - Summary of Significant Accounting Policies

**Basis of Accounting**
The financial statements have been prepared on the cash basis of accounting, which is a comprehensive basis of accounting other than accounting principles generally accepted in the United States of America. Consequently, the revenue is recognized when received and expenses are recorded when paid.

**Cash and Cash Equivalents**
Cash includes cash and cash equivalents, defined as liquid investments with maturities of three months or less.

The Organization maintains its cash balances in financial institutions located in Houston, Texas. Accounts at the institutions are secured by the Federal Deposit Insurance Corporation (FDIC) up to $250,000. As of October 31, 2016, the amount of $78,626 was not insured by FDIC.

**Transfer Fees**
Transfer fees are collected from members when a parcel is conveyed by one person to another (except in connection with division of community property). The transfer fee is paid by the new owner-member. The fee is a onetime assessment equal to 0.75% of the gross purchase price as presented on the closing statement or the appraisal value of the parcel as shown on the current records of Harris County Appraisal District. The transfer fee is collected at closing and submitted to the Organization by the title company.

**Garden Oaks Maintenance Organization, Inc.**
**Notes to Financial Statements**
**October 31, 2016**

**Note 3 - Summary of Significant Accounting Policies (continued)**

**Fair Value of Financial Instruments**
The Organization's financial instruments are cash and cash equivalents. The recorded values of the cash and cash equivalents, approximate their fair values based on their short-term nature.

**Estimates**
The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect certain reported amounts and disclosures. Accordingly, actual results could differ from those estimates.

**Note 4 - Lease Agreements**
The Organization leases office space under an agreement, expiring in May of 2016.  Since the expiration of the lease agreement, the Organization has continued in the space on a month-to-month basis. The monthly rent is $950. From November 1, 2015 to Oct 31, 2016, the organization incurred a total lease expense of $11,400.

**Note 5 - State Franchise Tax**
The Organization is exempt from Texas franchise tax as specified under Section 171.082 of the Texas Tax Code as a homeowners' Organization.

**Note 6 - Federal Income Tax**
The Organization is subject to federal income tax and must file an annual tax return. It has the option to file as a regular corporation, subject to general corporate tax provisions, or it can elect to file as a corporation pursuant to Internal Code Section 528. Under Section 528, the Organization is subject to specific rulings and regulations applicable to nonexempt membership organizations. This section imposes a flat 30% tax on the Organizations' "non-exempt function" income which consists primarily of interest income. The Organization evaluates both options and makes an annual election in order to minimize its income taxes. For the fiscal year ended October 31, 2016, the Association filed 1120 and the tax liability is $0.

The Organization adopted the accounting for uncertainty for income tax guidance, which clarifies the accounting and recognition for tax positions taken or expected to be taken in its income tax returns. The Organization's tax filings are subject to audit by various taxing authorities. The Organization's federal income tax returns for the fiscal year 2013, 2014 and 2015 remain open to examination by the Internal Revenue Service. In evaluating the Organization's tax provisions and accruals, the Organization believes that its estimates are appropriate based on current facts and circumstances.

7

**Garden Oaks Maintenance Organization, Inc.**
**Notes to Financial Statements**
**October 31, 2016**

**Note 7 - Commitments and Contingent Liabilities**
As of October 31, 2016, the Organization, in a case pending since December of 2012, is the plaintiff in a suit with a resident member relating to the enforcement of a deed restriction. The resident member filed a counterclaim alleging, among other things, that the Organization is improperly formed and requesting reimbursement of attorneys' fees. Management attempts at mediation had been unsuccessful and the Organization intended to go to trial. No provision has been made in the accompanying financial statements.

A verdict was rendered against the Organization on the deed restriction enforcement issues and on the formation issue, as to the defendants only; however, attorneys' fees were not awarded to the defendants. Management is unable to predict the effect of the ruling on future deed restriction enforcement but believes the Organization is properly formed and will continue operations. However, it is reasonably possible that the Organization's operations may change in the near term.

**Note 8 - Subsequent Events**
Upon evaluation, the Organization notes that there were no material subsequent events between the date of the financial statements and the date that the financial statements were issued or available to be issued.

Garden Oaks Maintenance Organization, Inc.

Financial Statements

October 31, 2015

## Contents

Independent Auditor's Report í  í  í  í  í  í  í  í  í  í  í  í  í  í  í  í  í  í  í ............í .....1

Financial Statements:

Balance Sheet ó Tax Basis..... í  í  í  í  í  í  í  í  í  í  í  í  í  í  í  í  í  í  í  í  í  í  í  í ..3
Statement of Revenues, Expenses and Changes in Fund Balances ó Tax Basis............................4
Notes to the Financial Statementsí  í  í  í  í  í  í  í  í  í  í  í  í  í  í  í  í  í  í  í .... ............5



**A Professional Corporation**
One Greenway Plaza, Suite 320
Houston, Texas 77046

Independent Auditor's Report

To the Board of Directors and Members
Garden Oaks Maintenance Association, Inc.
Houston, Texas

We have audited the accompanying financial statements of Garden Oaks Maintenance Association, Inc., which comprise the balance sheet- tax basis as of October 31, 2015, and the related statements of revenues, expenses- tax basis for the year then ended, and the related notes to the financial statements.

*Management's Responsibility for the Financial Statements*
Management is responsible for the preparation and fair presentation of these financial statements in accordance with the basis accounting the Association uses for tax basis purposes; this includes determining that the tax basis of accounting is an acceptable basis for the preparation of the financial statements in the circumstances. Management is also responsible for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

*Auditor's Responsibility*
Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

1

*Opinion*

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Garden Oaks Maintenance Association, Inc. as of December 31, 2015, and the results of its operations for the year then ended in accordance with the basis of accounting the Association uses for tax purposes described in Note 2.

*Basis of Accounting*

We draw attention to Note 2 of the financial statements, which describes the basis of accounting. The financial statements are prepared on the basis of accounting the Association uses for tax purposes, which is a basis of accounting other than accounting principles generally accepted in the United States of America. Our opinion is not modified with respect to this matter.

*Future Major Repairs and Replacements*

Our audit was made for the purpose of forming an opinion on the basic financial statements taken as a whole. We have not applied procedures to determine whether the funds designated for future major repairs and replacements. As indicated in Note 1, there is no common property and, as such, procedures and disclosures regarding future major repairs and replacements of its common property are not applicable. Our opinion is not modified with respect to this matter.

*Ralph and Ralph, P.C.*

Houston, Texas
August 24, 2016

Garden Oaks Maintenance Organization, Inc.
Balance Sheet – Tax Basis
October 31, 2015

**Assets**

Current assets

| | | |
|---|---|---:|
| Cash and cash equivalents | $ | 223,847 |
| Investments, certificates of deposit | | 201,775 |
| Total current assets | | 425,622 |
| | | |
| Property and equipment, computer and printer | | 3,198 |
| Property and equipment, office equipment and furniture | | 1,860 |
| Property and equipment, accumulated depreciation | | (3,415) |
| Total assets | $ | 427,265 |

**Liabilities and Fund Balance**

| | | |
|---|---|---:|
| Liabilities | $ | - |
| | | |
| Fund balance | | 427,265 |
| Total liabilities and fund balance | $ | 427,265 |

See notes to financial statements.

3

Garden Oaks Maintenance Organization, Inc.
Statement of Revenue, Expenses and Changes in Fund Balance – Tax Basis
For the Year Ended October 31, 2015

**Revenues**

| | | |
|---|---|---|
| Transfer fees, section 1 | $ | 97,149 |
| Transfer fees, section 2 | | 37,951 |
| Transfer fees, section 3 | | 50,482 |
| Transfer fees, section 5 | | 103,452 |
| Investment income | | 2,085 |
| Total revenue | | 291,119 |

**Expenses**

| | |
|---|---|
| Rent | 10,400 |
| Security, constable patrol | 152,266 |
| Computer and internet | 1,821 |
| Office and administrative | 4,090 |
| Maintenance | 21,288 |
| Insurance | 3,147 |
| Legal fees | 48,729 |
| Professional fees | 8,077 |
| Miscellaneous | 479 |
| Total expenses | 250,297 |

| | | |
|---|---|---|
| Excess (deficiency) of revenues over expenses | | 40,822 |
| Fund balance, beginning of year | | 386,443 |
| Fund balance, end of year | $ | 427,265 |

See notes to financial statements.

4

Garden Oaks Maintenance Organization, Inc.
Notes to the Financial Statements
October 31, 2015

**Note 1 – Organization**

Garden Oaks Maintenance Organization, Inc. (the Organization) was incorporated as a Texas non-profit organization in September of 2002 for the purpose of furthering the common interests of the Garden Oaks subdivision in Houston, Texas. The Organization collects transfer assessments from members. Its responsibilities include the preservation and maintenance of common property (if any), enforcement of deed restrictions and promotion of the recreation, safety and welfare of the residents within Garden Oaks subdivisions 1, 2, 3 and 5. Each person or entity, who is a record owner of a fee or undivided fee interest in any parcel of land (as defined in the deed restrictions) in the applicable subdivisions is a member of the Organization. As of December 31, 2015, there is no subdivision common property.

**Note 2 - Significant Accounting Policies**

*Basis of Presentation*
The financial statements are presented on the tax basis of accounting, which is another comprehensive basis of accounting. Revenue is reported in the accounting period received; expenses are reported in the accounting period paid.

*Estimates*
The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

*Federal Income Taxes*
Homeownersø Associations may be taxed either as a homeowners association or as regular corporations. For the year ended October 31, 2015, the Organization was taxed as a regular corporation and filed Form 1120. As a regular corporation, membership income is exempt from taxation if certain elections are made, and the Organization is taxed only on non-membership income, such as interest earnings at regular federal and state corporate rates. . In accordance with U.S. tax law, the federal tax returns for 2013, 2014 and 2015 remain open for examination by the IRS.

*Cash and Cash Equivalents and Investments*
For purposes of the financial statement presentation, cash and cash equivalents include all highly liquid investments with original maturities of three months or less. Certificates of deposit are carried at amortized cost.

*Transfer fees*
Transfer fees are collected from members when a parcel is conveyed by one person to another (except in connection with division of community property). The transfer fee is paid by the new owner-member. The fee is a onetime assessment equal to 0.75% of the gross purchase price as presented on the closing statement or the appraisal value of the parcel as shown on the current records of Harris County Appraisal District. The transfer fee is collected at closing and submitted to the Organization by the title company.

*Property and Equipment*
Capitalized common property is recorded at cost and depreciated over its estimated life using the straight line method of depreciation. Estimated useful lives of property and equipment held by the Organization at October 31, 2015 range from five to seven years. For the year ended October 31, 2015, the Organization incurred $516 in depreciation expense.

Garden Oaks Maintenance Organization, Inc.
Notes to the Financial Statements (Continued)
October 31, 2015

**Note 3 - Fair Value**

Generally accepted accounting principles require that certain assets and liabilities be reported at fair value and establish a hierarchy that prioritizes the inputs used to measure fair value. Fair value is the price that would be received to sell as asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. The three levels of the fair value hierarchy are as follows:

- *Level 1* – Inputs are unadjusted quoted prices in active markets for identical assets and have the highest priority.
- *Level 2* – Inputs are other than quoted prices included in Level 1, which are either directly observable or can be derived from or corroborated by observable market data at the reporting date.
- *Level 3* - Inputs are not observable and are based on the reporting entity's assumptions about the inputs market participants would use in pricing the asset or liability.

Investments in certificates of deposit are presented at amortized cost, a Level 2 valuation.

The Organization's other financial instruments are cash and cash equivalents. The recorded values of these items approximate their fair values based on their short-term nature.

**Note 4 – Lease Agreements**

The Organization leases office space under an agreement, expiring in May of 2016. During 2015, the organization incurred a total lease expense of $10,400. Since the expiration of the lease agreement, the Organization has continued in the space on a month-to-month basis.   Future minimum lease payments as of October 31, 2015 are $5,700 for the 2016 fiscal year.

**Note 5 - Commitments and Contingent Liabilities**

As of October 31, 2015, the Organization, in a case pending since December of 2012, is the plaintiff in a suit with a resident member relating to the enforcement of a deed restriction. The resident member filed a counterclaim alleging, among other things, that the Organization is improperly formed and requesting reimbursement of attorneys' fees.   Management attempts at mediation had been unsuccessful and the Organization intended to go to trial.   No provision has been made in the accompanying financial statements.

Subsequent to October 31, 2015, a verdict was rendered against the Organization on the deed restriction enforcement issues and on the formation issue, as to the defendants only; however, attorneys' fees were not awarded to the defendants.  Management is unable to predict the effect of the ruling on future deed restriction enforcement but believes the Organization is properly formed and will continue operations. However, it is reasonably possible that the Organization's operations may change in the near term.

**Note 6 – Subsequent Event Review**

In preparing the financial statements, the Organization has evaluated the events and transactions for potential recognition or disclosure through August 24, 2016, the date that the financial statements were available to be issued.

# **EXHIBIT D**

**Financial Statement FYE October 31, 2016**

## **EXHIBIT E**

**Print of GOMO Website**

GOCC +    Events  ▾    Gazette    Security  ▾    Green Thumb  ▾    Neighbor

Contribute  ▾

📄 GOMO    Deed Restrictions    Title Co. Info    Building Plans    Records    Q &

Members  ▾

# Fee & HOA Information

## GOMO has No Annual Fees!! ONLY Transfer Fees

---

- Transfer Fees apply to Section 1, 2, 3, & 5 when property is sold
- Garden Oaks Maintenance Organization does NOT have a mandatory annual Homeowners Association Fee
- Section 4 has no transfer fee
- Documentation of the sales price should be submitted with payment
- The new owner is obligated to pay a one time assessment (Transfer Fee) when a parcel is conveyed by one person to another (except in connection with the division of community property after a divorce *where ownership is conveyed to one of the original owners* or as the result of the death of an Owner *when conveyance is to an heir*
- The Transfer Fee is equal to 0.75% of the greater of (a) the gross purchase price of the Parcel as shown on the closing statement, or (b) the appraisal of the Parcel as shown *as the* market valuation on the then-current records of the Harris County Appraisal District.

  **Example: $400,000 X 0.0075 = $3000.00**
- Please calculate this fee at closing

For the following list of reasons, Resale Certificates, 60 Day letters and proof of liability insurance (GOMO) are rarely requested for property sales in Garden Oaks. If your Title or Mortgage Co. asks for one of these we suggest you seek a waiver of the requirement.

*It may save you money!*

- GOMO does not collect monthly or annual maintenance fees from owners and does not maintain "account balances" typical of HOAs who do collect these types of fees
- GOMO is prohibited from placing a lien on any property in Garden Oaks by *Amendment A* which created GOMO.
- GOMO does not own real property nor does it manage common areas
- Deed Restrictions, Bylaws, Operating Budget and Balance Sheet are posted on the GOMO website
- Information requested in a Resale Certificate which is not applicable to Garden Oaks properties are: Rules, Government Notices of Health or Housing Code Violations & Certificate of Insurance for Common Areas.
- Additional Information included in a Resale Certificate would be:
  - a listing of unsatisfied judgements against GOMO = currently none
  - a listing of pending suits = currently none
  - a listing of existing violations pre-sale on the property = these are unenforceable per deed restrictions

Resale Certificate GOMO

60 Day Letter

GO Civic Club

GOCC +     Events ▾     Gazette     Security ▾     Green Thumb ▾     Neighbor

Contribute ▾

🖹 GOMO     Deed Restrictions     Title Co. Info     Building Plans     Records     Q &

Members ▾

Neighborhood

Contribute ▾

**Shared**

GOMO & GOCC+

Home

Privacy Policy

Credits

Site Info

Members ▾

Calendars

Maps

**GO Maintenance Org.**

Home GOMO

Deed Restrictions

▾

Title Co. Info

Building Plans

Records

Q & A +

**Google Analytics Stats**

GOCC +     Events ▼     Gazette     Security ▼     Green Thumb ▼     Neighbor

Contribute ▼

▤ GOMO     Deed Restrictions     Title Co. Info     Building Plans     Records     Q &

Members ▼

*Last 30 Days*

**Sessions** 0

GOMO & GOCC+ © 2018